## Ex parte POLLARD, and Ex parte WOODS.

[APPLICATIONS FOR MANDAMUS TO CITY COURT.]

1. *Constitutionality of "act to regulate judicial proceedings," approved Feb. 20, 1866, as impairing obligation of contracts, and delaying justice.*—The first and eighth sections of the act approved February 20, 1866, entitled "An act to regulate judicial proceedings," (commonly known as the "stay-law,") which postpone the rendition of judgment for at least twelve months, are not, in their operation on pre-existing contracts, violative of the constitutional provision against laws impairing the obligation of contracts, nor of the fourteenth section of the bill of rights, which declares that "all courts shall be open," and that right and justice shall "be administered without sale, denial, or delay." (WALKER, C. J., *dissenting* on the first point, held the whole law unconstitutional and void.)

2. *Same, as affected by constitutional provisions as to title, subject-matter, and form.*—The provision of the fifth section of said act, which prohibits sales by mortgagees without actual possession of the property, not being in any sense a regulation of judicial proceedings, is violative of the second section of the fourth article of the constitution, which requires that the subject-matter of the act "shall be distinctly stated in the title;" but the unconstitutionality of this section does not affect the validity of the other provisions of the act, which are appropriately described in the title; nor is said act, though in effect amendatory of other general laws, violative of that provision of said second section of the fourth article of the constitution, which requires that " the law or section revised or amended shall itself be set forth at full length" in the amendatory act.

APPLICATIONS for the writ of *mandamus* to the City Court of Montgomery, Hon. B. S. BIBB presiding. The two cases were argued and submitted at the last term of the court, and were held under advisement until the present term. In

*Ex parte Pollard,* the petitioner, as surviving partner of the late firm of Thiess & Pollard, instituted an action in said city court, on the 9th January, 1866, against Willliam Falconer; and the summons was duly executed on the 10th January.   On the 26th February, 1866, a day of the regular February term of said court, when the cause was reached in its order on the docket, "the plaintiff moved for a judgment, because the defendant has failed to plead to the complaint; but the court overruled the motion, and refused to take any action in said cause, because, by the terms of the law passed at the late session of the legislature, entitled 'An act to regulate judicial proceedings,' such cases as this can not be tried at the term to which the summons is made returnable, notwithstanding the summons and complaint have been served on the defendant more than twenty days before the sitting of the court; and the court refused, for these reasons, to take any action in said cause."   The plaintiff duly reserved a bill of exceptions to the overruling of his motion, and applied to this court for a *mandamus* to said city court, to compel it to render judgment as asked.

In *Ex parte Woods,* a judgment was rendered against the petitioner by said city court, on the 6th day of September, 1860; and on the 10th March, 1866, an execution was issued on said judgment, and was levied on his lands.   The petitioner thereupon made a suggestion in writing to the sheriff, that there was an illegality or irregularity in the execution, and, having paid the costs due to the officers of court, requested that the execution might be returned "stayed by suggestion under the statute."   The sheriff refused to comply with the request, "on the ground that there is no law authorizing the same," and notified the defendant that he should proceed to sell the land under the execution.   The defendant then applied by petition to said city court, "for the writ of *mandamus,* or other appropriate writ or order, to be issued to the said sheriff, commanding and requiring him to refrain from further proceedings under said execution, and to return the same 'stayed by suggestion under the statute'."   The city court refused the application, "on the ground that the provisions of the act to regulate judicial proceedings, so far as they relate to executions, are uncon-

stitutional and void;" and the petitioner thereupon renewed his application to this court.

The act approved February 20th, 1866, entitled "An act to regulate judicial proceedings," the constitutionality of which is involved in these cases, is in the following words:

"SEC. 1. *Be it enacted*," *&c.*, "That in all suits commenced since the first day of May, 1865, or hereafter commenced, in this State, the first term of said court after the commencement of said action shall be deemed and held the return term only; the second term, an appearance and pleading term; and no such action shall be tried before the term next after the appearance term thereof.

"SEC. 2. *Be it further enacted*, That when any levy shall be made, or has been made, under any execution, (except for taxes and debts due the State,) any defendant therein, upon delivering to the officer holding such execution a written suggestion that there is some irregularity or illegality in the execution, or in its issue, or in the proceeding under it, and shall pay the costs due the officers of court upon the same, (sheriff's commissions not included,) shall have the right to give bond in double the amount of property levied upon, (if personal property,) to be ascertained by the officer levying the same, and approved by him, payable to the plaintiff, and conditioned to deliver the said execution (?) or pay to the amount of the value of said property, as ascertained by said officer, if said suggestion shall be determined against the said defendant; and when the levy is upon land or real estate, the defendant shall be allowed to make and have the said suggestion without any bond. The said suggestion and bond shall operate as a *supersedeas*, and shall be returned with the execution to the court to which said execution is returnable, with an endorsement on the execution to this effect, to-wit: If levied on real estate, "stayed by suggestion under statute," and if on personal property, "stayed by suggestion and bond under the statute." The court to which such return is made shall try any issue made up as to the truth of such suggestion. If the suggestion is established as true, the court shall enter judgment, amending the defect or defects which may be shown, at the cost

of the plaintiff in execution, and declaring the bond, if levied on personal property, to have the force and effect of a judgment, against all the obligors therein, at the cost of the defendant in execution and his securities, for the amount of the value of the property levied upon, as fixed by the officer taking the said bond, if the said property levied upon shall not be delivered according to the condition of said bond, as provided by this section; and if the issue shall be determined against the defendant, judgment shall be entered against him and the securities as above provided; and when said levy is upon land, and the said suggestion is established as true, then the defect or defects shall be amended at the cost of the plaintiff, and if not established as true, then judgment shall be entered up against the defendant for cost. From any such judgment either party may take an appeal within six months, either to the circuit or supreme court, upon giving an appeal bond in double the amount of the execution, payable to the appellee, with sufficient security, and with condition to prosecute the appeal to effect, and satisfy such judgment as the appellate court may render in the premises; which bond may be approved by the judge, clerk, or register of the court from which the appeal is taken, and shall operate as a *supersedeas: Provided,* that all the provisions of this section shall apply to executions or orders of sale issued in cases commenced by attachment, or in which attachments may have been, or may hereafter be issued, as fully as to an execution issued in any other kind of a case.

"SEC. 3. *Be it further enacted,* That when the defendant shall make a suggestion and give bond under the second section of this act, and the execution is returned, with the endorsement, to the court, said suggestion shall not be tried at that term of the court, unless by consent of the parties, but shall stand continued over until the next term of the court.

"SEC. 4. *Be it further enacted,* That if the defendant in execution, on any judgment now existing, shall pay, on or by trial term of said suggestion, one-third of the principal and interest, together with all cost due thereon, said cause shall stand continued until the next term of said court.

"SEC. 5. *Be it further enacted,* That in case any deed of trust, or mortgage with power of sale, has been, or may be executed in this State, to secure the payment of any debt or debts, it shall not be lawful for the trustee or creditor named in such deed or mortgage to sell any property so conveyed, without having actual possession thereof, so as to deliver the same to the purchaser upon making said sale. And in the event the grantor in any such deed of trust, or mortgage with power of sale aforesaid, shall fail or refuse to deliver, on demand, possession of any property or estate so conveyed, after having made default in payment of the debt thereby secured, it shall be lawful for the trustee or creditor claiming to have legal title to sue for the possession of the same ; and if personal property, the sheriff, upon suit being brought, and affidavit of title, as in detinue cases, as provided by the Code, with the same terms and conditions as therein provided, shall take bond for the delivery of the property as provided by said Code in such detinue cases.

"SEC. 6. *Be it further enacted,* That, hereafter, justices' courts in this State, for the trial of civil causes, shall be held semi-annually, at such times and places as the justices in each beat may appoint, and may continue from day to day until the business is disposed of ; and the term to which any original process, summons, warrant, or complaint shall be made returnable, shall be deemed and held the docket term, or appearance term of said court, and the cause shall stand for trial at the next ensuing term thereafter ; and on all judgments rendered by any justice, in any civil cause, the party or parties against whom such judgment may be rendered shall, at any time thereafter, and before the payment of the same, have the right of appeal to the next term of the circuit court of the county in which such judgment may be rendered, upon giving such appeal bond, with surety, as is now required by the law ; and the term to which such appeal may be taken shall be the return term thereof, and the next succeeding term shall be the trial term thereof ; and in no case shall a county tax be charged on such appeal, unless the expense of a jury trial be incurred ; nor shall any damages over and above the debt and interest in any

case be allowed. Justices of the peace shall make their executions returnable to the regular semi-annual term next after the rendition of any judgment. The above right of appeal shall apply to any and all judgments in said justices' courts now existing, as well as those which may hereafter be rendered, and all judgments and executions in justices' courts shall be subject to the suggestion and proceedings provided for in section 2d of this act.

"SEC. 7. *Be it further enacted,* That the provisions of this act shall not apply to proceedings in the courts of admiralty, nor to any action in detinue, or forcible entry and detainer, or unlawful detainer.

"SEC. 8. *Be it further enacted,* That in all cases of suits brought in city courts having civil jurisdiction, and where terms are held oftener than twice in each year, no judgment shall be obtained within a shorter period of time than is prescribed in the 1st section of this act. But the return, appearance and judgment terms, on suits brought in such courts, must each be intervened by a space of, at least, six months.

"SEC. 9. *Be it further enacted,* That all laws and parts of laws contravening the provisions of this act be, and the same are hereby repealed : *Provided,* that this act shall not so operate as to repeal or destroy any lien of any judgment, decree, or execution now in existence, or the lien of any judgment or decree that may be substituted under the laws of this State authorizing the substitution of lost or burnt records."

WATTS & TROY, and GEO. GOLDTHWAITE, for the petitioner Pollard, and against the petitioner Woods.

P. T. SAYRE, *contra.*

JUDGE, J.—These cases relate to different sections of the act to regulate judicial proceedings, approved February 20th, 1866. *Ex parte Pollard* relates to the first and eighth sections of the act, and *Ex parte Woods* to the second, third and fourth sections. Both cases will be considered together.

Section 10 of article I of the constitution of the United

States provides, that no State shall pass any law impairing the obligation of contracts. There is a distinction between the obligation of a contract, and the remedy given to enforce that obligation. The obligation is the law which binds the parties to perform their agreement, according to its essence, nature, construction, and extent. The remedy is the means employed to enforce the obligation. The law which confers the right, inheres in, and follows the contract, wherever it may go. The remedy is dependent on the local legislation of the place where the parties seek to enforce the right. In the language of Chief-Justice Marshall, "They originate at different times. The obligation to perform is coeval with the undertaking to perform; it originates with the contract itself, and operates anterior to the time of performance. The remedy acts upon a broken contract, and enforces a pre-existing obligation."—*Ogden v. Saunders*, 12 Wheaton, 335.

The doctrine that the remedy is grafted into the contract, was held by Mr. Justice Johnson, in the case above cited, to be untenable, and restrictive of State powers. He said: "If the remedy enters into the contract, then the States lose all power to alter their laws for the administration of justice." In the same case, he said further: "The law of the contract remains the same everywhere, and it will be the same in every tribunal; but the remedy necessarily varies, and with it the effect of the constitutional pledge, which can only have relation to the laws of distributive justice known to the policy of each State severally." To hold the contrary, would make the obligation, as has been aptly said, "ambulatory and uncertain, and mean a different thing in every State in which it may be necessary to enforce the contract." It would produce a "motley, multiform administration of laws."—*Hawkins et al. v. Barney's Lessee*, 5 Peters, 457.

In the early discussions of this question, it was contended that, if the obligation and the remedy were not identical, the union between them was so intimate, that legislation could scarcely touch the latter without affecting the former. Chief-Justice Marshall, in *Ogden v. Saunders*, thus states the position, and the answer to it: "But, although the iden-

tity of obligation and remedy be disproved, it may be, and has been urged, that they are precisely commensurate with each other, and are such sympathetic essences, if the expression may be allowed, that the action of law upon the remedy is immediately felt by the obligation; that they live, languish, and die together. The use made of this argument, is to show the absurdity and self-contradiction of the construction which maintains the inviolability of the obligation, while it leave the remedy to the State governments. We do not perceive this absurdity or self-contradiction. Our country exhibits the extraordinary spectacle of distinct, and, in many respects, independent governments, over the same territory and the same people. The local governments are restrained from impairing the obligation of contracts, but they furnish the remedy to enforce them, and administer that remedy in tribunals constituted by themselves. It has been shown that the obligation is distinct from the remedy; and it would seem to follow, that a law might act on the remedy without acting on the obligation."

The same position is contended for at this day, as it was in the day of Chief-Justice Marshall; and it is said there has, of late, been a tendency in the courts of the United States to render the distinction between the obligation and the remedy to a great extent inoperative. This tendency to a "distinction without a difference," it is said, is shown by the later decisions on the subject, of the highest judicial tribunal of the Union, commencing with *Bronson v. Kinzie*, 1 Howard, 315.

We propose to notice briefly the principal decisions indicated, to ascertain if any such conclusion can be legitimately drawn from them; and we premise by saying, it is a general rule, that the positive authority of a decision is co-extensive only with the facts on which it was made.

In *Bronson v. Kinzie*, the adjudication was upon two statutes of the State of Illinois, one of which declared that the equitable estate of a mortgagor should not be extinguished for twelve months after a sale under a decree in chancery; and the other, that no sale of the property should be made, unless it would bring two-thirds of its valuation, according to the appraisement of three householders. As regarded

mortgages made prior to their passage, these acts were held to be unconstitutional; the first, for the reason that it gave to the mortgagor and to the judgment-creditor an equitable estate in the premises, which neither of them would have been entitled to under the original contract, which new interests were directly and materially in conflict with those which the mortgagee acquired when the mortgage was made; and the second, because its effect was to deprive the party of his pre-existing right to foreclose the mortgage by a sale of the premises, and to impose upon him conditions which would frequently render any sale altogether impossible; and because, further, it was not a general law, but confined to judgments rendered, and contracts made, prior to the first of May, 1841, (the act having been passed on the 27th February of that year,) by which it was made to operate mainly on past contracts, and not on future.

In this case, Chief-Justice Taney, in delivering the opinion of the court, said: "If the laws of the State, passed afterwards, had done nothing more than change the remedy upon contracts of this description, they would be liable to no constitutional objection. For, undoubtedly, a State may regulate, at pleasure, the modes of proceeding in its courts in relation to its past contracts, as well as future." He said further: "Whatever belongs merely to the remedy, may be altered according to the will of the State; provided the alteration does not impair the obligation of the contract."

*McCracken v. Hayward* (2 Howard, 609): In this case, the identical statute last above named, in its application to a sale under an execution in a suit at law, came again under review, and was again pronounced unconstitutional and void as to contracts made prior to its passage. The court held, that if the power existed at all in a State legislature to prohibit a sale in such case, it might be carried to any extent; it might prohibit a sale for less than the whole appraised value, or for three-fourths, or nine-tenths, as well as for two-thirds; which would be exercising uncontrollable discretion in passing laws relating to the remedy, regardless of the effect on the obligation of contracts.

It has been contended that Mr. Justice Baldwin, in de-

livering the opinion of the court in this case, used language which gives countenance to the idea of a tendency on the part of the court to hold the remedy so intimately connected with the obligation as to be, in many respects, a part of it; and consequently to prohibit, to a great extent, State legislation upon the remedy. As regards the cases of *Bronson v. Kinzie*, and *McCracken v. Hayward*, we adopt the language of the court of appeals of the State of New York, in *Morse v. Goold*, 1 Kernan, 292. Judge Denio, in delivering the opinion of the court, after saying that in both the cases the statute of Illinois was, in his opinion, rightfully held to impair the obligation of the contract, used this language : " I do not understand either of the cases to determine that the law respecting legal procedure, in existence when the contract was made, can not be changed in such a manner as to operate upon existing contracts. In the able and discriminating opinion of Chief-Justice Taney, in the first case, the [right to make such *changes* is distinctly asserted ; and if the opinion in *McCracken v. Hayward* holds the contrary, it was unnecessary to go that length, and the doctrine would be hostile to the principle of several prior cases, *and an unwarrantable restriction upon the powers of the State governments.*"

*Grantley's Lessee v. Ewing* (3 Howard, 307): In this case, a statute of the State of Indiana was in question. After an execution had been issued on a decree of foreclosure of a mortgage, requiring the "mortgaged premises to be sold as other lands are sold on execution," an act was passed by the legislature, which provided that thereafter no property should be sold on execution for less than one-half of its cash value at the time of sale, to be ascertained by three freeholders at the instance of the officer. This act was held to be unconstitutional as to pre-existing contracts. The court said : "If the legislature could make this alteration in the contract, and in the decree enforcing it, so it could declare the property should bring its entire value, or that it should not be sold at all, thereby impairing the obligation under the disguise of regulating the remedy."

*The Planters' Bank of Mississippi v. Sharp et al.* (6 Howard, 327) : In this case, there was involved the constitution-

ality of an act of the legislature of the State of Mississippi, which prohibited any bank in the State from transferring by endorsement, or otherwise, any note, bill receivable, or other evidence of debt; and provided that, if it should appear in evidence, upon the trial of any action upon any such note, bill receivable, or other evidence of debt, that the same had been transferred, the action should abate upon the plea of the defendant.  The right was given to the bank in its charter to discount bills of exchange and notes, and to make loans, &c.; and in the course of business under its charter, the bank discounted and held promissory notes. It was held, that this act vitally changed the obligation of the contract between the makers of such notes and the bank to pay them to any assignee thereof, as well as changed the obligation of the other contract between the State and the bank, in the charter, to allow such notes to be taken and transferred.   Mr. Justice Woodbury, in delivering the opinion of the court, said: "Laws are referred to, which are upheld, and which affect the whole community, and seem to violate some of the important incidents of contracts between individuals, or between them and corporations.   But it will usually be found that these are such laws only as relate to future contracts, *or, if to past ones, relate to modes of proceeding in courts, or to the form of remedy merely.*"

*Curran v. The State of Arkansas et al.* (15 Howard, 304) : The legislature of Arkansas incorporated the Bank of Arkansas, with the usual banking powers, the State being the sole stockholder; the bank went into operation, issued bills, and suspended specie payments; subsequently the legislature passed several acts, the effect of which was to withdraw the assets of the bank, and appropriate them to different purposes, for the benefit of the State.  The court held, (the bills of the bank being payable on demand,) that there was a contract with the holder to pay them, and that the laws withdrawing the assets into a different channel, and leaving the bill-holder unprovided for, impaired the obligation of the contract.

*Howard v. Bugbee* (24 Howard, 461): In this case, a statute of the State of Alabama, authorizing the redemption of mortgaged property, by *bona-fide* creditors of the mortga-

gor, in two years after the sale under a decree, was declared to be unconstitutional and void, as to sales made under mortgages executed prior to the date of its enactment, as impairing the obligation of the contract. This decision was based, mainly, on the authority of *Bronson v. Kinzie.* The statute pronounced upon changed the legal effect of the mortgage, by giving an estate, which before had no existence, to *bona-fide* creditors of the mortgagor, to continue for two years; and this brought the case directly within the influence of *Bronson v. Kinzie.*

We think it may be legitimately deduced from these and other decisions of the same court —

1. That the distinction between the obligation and the remedy clearly exists, and is fully operative.

2. That it is consequently in the power of the State legislature to regulate the remedy and modes of proceeding, in relation to past, as well as future contracts.

3. That this power is subject only to the restriction that it cannot be exercised so as to take away all remedy upon the contract, or to impose upon it new burdens and restrictions which materially impair the value and benefit of the contract.

4. And that, although almost every law providing a new remedy affects and operates upon causes of action existing at the time the law is passed, and may make the recovery of debts more tardy and difficult than the old one; yet *the obligation and the remedy being distinct,* it will not follow that the law is unconstitutional.—Sedg. Stat. & Con. Law, 659; *Sturges v. Crowninshield,* 4 Wheaton, 122; *Mason v. Haile,* 12 *ib.* 370; *Green v. Biddle,* 8 Wheaton, 84; *Ogden v. Saunders,* 12 Wheaton, *supra; Jackson v. Lamphire,* 3 Peters, 280; *Hawkins v. Barney's Lessee,* 5 Peters, 457; *United States v. Sampeyrac,* 7 Peters, 222; and cases before cited.

In the exercise of the power to legislate on the remedy, the chief difficulty lies in drawing, with precision, the line between the right and the remedy. Such a line, one that would be applicable in all cases, has not been drawn by the supreme court of the United States. On the contrary, the statute before it in each case seems to have been tested

by its own particular provisions. Legislation of this character assumes so many different phases, that we think this the only safe and proper course to be pursued; applying at the same time the test of previous decisions and of principle. We shall not, therefore, undertake, in advance of that high tribunal, to deduce a rule from its decisions, not prescribed by itself, by which all cases are to be squared; especially when the effect would be to abridge the sphere of necessary and wholesome State legislation, beyond what it can for a moment be believed was ever contemplated in the formation of the constitution.

We will now proceed to the consideration of the sections of the act before us.

The first section is as follows: "That in all suits commenced since the first day of May, 1865, or hereafter commenced, in this State, the first term of said court, after the commencement of said action, shall be deemed and held the return term only; the second term, an appearance and pleading term; and no such action shall be tried before the term next after the appearance term thereof."

The eighth section, in effect, provides, that when the terms of the city courts are held oftener than twice in each year, no judgment shall be obtained in said courts within a shorter space of time than is prescribed in the first section of the act; and that six months shall intervene between the return, appearance, and judgment terms each, of said courts.

Since the organization of the State, at least two sessions of the circuit court have been required to be held, in each year, in every county in the State; and they are usually intervened by a space of six months.

In December, 1820, the legislature enacted: "That it shall be lawful in all actions of debt, *assumpsit*, and covenant, to take judgment at the return term thereof; but the defendant may, upon filing a plea to the merits, have the suit continued."—Toulmin's Digest, 487. The result was, that in every case where a defendant desired a continuance, he obtained it by filing a plea to the merits, whether he had a meritorious defense or not. Thus continued the law until 1839, when it was provided by statute, that in all suits

for the collection of money, no judgment should be rendered at the appearance term, except by the consent of parties, from the failure of defendant to plead, or enter an appearance.—Clay's Digest, 334, § 115. On the 17th of January, 1853, the Code of Alabama went into operation; which provides for the commencement of civil actions by service of a summons; if the summons is issued less than three days before the term of the court next thereafter, it must be made returnable to the next succeeding term after that; if executed twenty days or more before the return day thereof, it is required to be returned within five days after its execution, to be placed on the trial docket, and to stand for trial at the first term, unless good cause be shown for a continuance.—Code, § § 2166-7, 2257. And thus stood the law, when the act before us was passed.

Thus it is seen, that from the first organization of the State to the adoption of the Code, a period of more than thirty years, there was a return term and a trial term for all suits in the circuit court; that up to 1839, no judgment could be rendered at the return term, unless the defendant failed to plead to the merits; that from 1839, to the adoption of the Code, no judgment could be rendered at the return term, whether a plea was filed, or an appearance was entered, or not; and that from the adoption of the Code, to the passage of the act before us, judgment might be rendered at the return term, provided the summons was executed twenty days, or more, before the return day thereof; otherwise, not until the second term of the court after the commencement of the suit.

We are not aware that the constitutionality of any of the previous legislation, above referred to, was ever questioned, on the ground that it either delayed or expedited the remedy. This legislative exposition, with the silent acquiescence of the people, including the legal profession and the judiciary, during so long a period of the State's history, is a proper element of a legal judgment on the subject, and is entitled to great weight.—*Moers v. The City of Reading*, 21 Penn. 188. But these, we admit, cannot in any case be carried so far as to override the express terms of the constitution.

The first and eighth sections of the act operate to delay the trial of causes, as compared with previous laws on the subject, as follows : In suits against defendants upon whom process has *not* been served twenty days or more, before the return term thereof, trials are delayed six months ; and in suits in which the process *has* been served twenty days or more, before the return term, trials are delayed twelve months. This relates exclusively to the remedy, and does not, in our opinion, impose upon pre-existing contracts new burdens and restrictions which impair their obligation within the meaning of the constitution; for, in the language of Chief-Justice Taney, in *Bronson v. Kinzie*, "Although a new *remedy may be deemed less convenient than the old one, and may in some degree render the recovery of debts more tardy and difficult, yet it will not follow that the law is unconstitutional.*"

A fair application of the principles established by the supreme court of the United States does not, in our opinion, require a different conclusion as to these sections of the act.

To warrant the court's setting aside a law as unconstitutional, the case must be so clear that no reasonable doubt can be said to exist; and when this delicate duty is performed in a case which requires it, it is more in fulfillment of their own duty than to restrain the excesses of a co-ordinate department of the government.—*Crane v. Meginnis*, 1 Gill & Johnson, 463.

We may remark that other remedial statutes enacted for the benefit of the creditor remain unaltered. Contemporaneous with the institution of his suit, he may, in a proper case, have process of garnishment to secure his debt. He may, before judgment, on making the proper affidavit, take out bail process against the body of his debtor ; and also have his goods and chattels taken under process of attachment.

The cases decided·in the highest judicial tribunals of the respective States, sustaining the conclusion to which we have arrived as to the first and eighth sections of the act, are almost too numerous to be cited in a single opinion. In the citations of authority thus far made, we have confined ourselves mainly to cases determined in the supreme court

of the United States, for the reason that, on constitutional questions like the present, we are to be controlled by its adjudications. We feel it to be our duty, however, to cite the decisions of our own State, bearing upon the question.

Commencing with the first organization of this court, and coming down almost to the present period of time, numerous decisions have been made, sustaining the principle that the legislature may, consistently with the constitution, alter, enlarge, modify, or confer a remedy for existing rights; and that such statutes relate only to the remedy, and may have retroactive, as well as prospective operation. *Wheat v. The State*, Minor, 199; *Anonymous*, 2 Stew. 288; *Aldridge v. Tuscumbia R. R. Co.*, 2 Stew. & Porter, 119; *Bloodgood v. Cammack*, 5, Stew. & Porter, 276; *Rathbone v. Bradford*, 1 Ala. 312; *Weaver v. Weaver*, 23 Ala. 789; *Hoffman v. Hoffman*, 26 Ala. 539; *Daily v. Burke*, 28 Ala. 328; *Coosa River S. Boat Co. v. Barclay & Henderson*, 30 Ala. 120; *Curry v. Landers*, 35 Ala. 280.

With the motives and views of policy by which the legislature was actuated in passing the act, we have nothing to do. As a co-ordinate department of the State government, while acting within the sphere of its duty, it was the proper judge of what the policy and the necessities of the State required, being restricted only by constitutional inhibition. All, however, know what was the condition of the State, and the circumstances under which the legislature acted. A war of magnitude, of years' duration, had just closed; its prosecution had called forth and exhausted nearly the entire resources of the State; devastation and ruin had literally been produced. Its people were impoverished, and many of them starving, while some had not yet returned from their prisons of war. Parties to suits, and to contracts, and witnesses, many of them were dead. In many instances, records and papers, important to suitors, had been destroyed by fire, or otherwise lost. Under these circumstances, the legislature might well have given some delay in the preparation of causes for trial; for, in the language of Justice Johnson, in *Ogden v. Saunders*, "it is among the duties of society to enforce the rights of humanity; and both the debtor and society have their inter-

ests in the administration of justice, and in the general good; interests which must not be swallowed up and lost sight of, while yielding attention to the claim of the creditor."

A position taken in the argument, and which we have not yet adverted to, we will now briefly notice. It is contended that the first and eighth sections of the act are in conflict with the 14th section of the bill of rights, which declares that " all courts shall be open, and every person, for an injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered, without sale, denial, or delay."

This provision had its origin in " *Magna Charta*," and was intended as a restriction upon royal power. It is an historical truth, that in England, the struggle has constantly been to place limitations upon the power of the crown, and not upon that of the parliament. We admit, however, that in our country, it applies to legislative and all other power.—2 Coke's Institutes, p. 55 ; *Townsend v. Townsend*, Peck's (Tenn.) Reports, 14. But, whilst it is the promulgation of a wholesome restriction, and is of no little value as a safeguard against error and injustice, the landmarks of legislative authority are rather to be found in the division of power contained in the constitution, among the three branches of government, and the specific limitations imposed by the instrument on the law-making branch, than in this general declaration of the bill of rights.—Sedgwick Stat. and Con. Law, 180. But however this may be, we are satisfied that legislation as to remedies and modes of procedure in courts of justice, of the character of that in the first and eighth sections of the act, is not obnoxious to this provision. If it were necessary, we might invoke the aid of legislative exposition upon this question also, by referring to the previous legislation of a similar character already noticed, the commencement of which was coeval with the adoption of the bill of rights itself, which was incorporated in the first, and all subsequent constitutions of the State.

But, whilst we sustain the first and eighth sections of the act, we are constrained to pronounce the second, third, and fourth sections to be unconstitutional as to pre-existing

contracts. A statute which gives time for something to be done in respect to the determination of a right, is more decisively superior to exception than one which gives time for the sake of procrastination merely.—*Chadwick v. Moore*, 8 Watts and Serg. 52. Under the provisions of section second, as often as an execution may be issued in any case, just so often may it be superseded by a "suggestion of irregularity"; and by proceedings under this section, and sections three and four, which are dependent upon it, the creditor, even after obtaining judgment, may be left almost in a condition, as was aptly said in another case, "in which his rights live but in grace, and his remedies in entreaty only". But the reasons for our conclusion as to these sections, are more fully given by the Chief-Justice; and we refer to and adopt that portion of his opinion *which relates especially to them.* The same reasoning would apply also to the last clause of section six, which provides for similar suggestions and proceedings, as to judgments and executions in justices' courts. It must not be understood, however, that this affects the remainder of section six, which relates to justices' courts, and proceedings before them. No distinct question is presented as to this section, nor as to section seven; but it would seem to follow, from what we have said as to the first and eighth sections, that they are valid provisions.

The only remaining question to be disposed of, is this: It is contended that the legislature, in passing the act, did not conform to the requisitions of that portion of section 2, of article 4, of the constitution of the State, which provides that "each law shall embrace but one subject, which shall be described in the title; and that no law, nor any section of any law, shall be revised or amended by reference only to its title and number, but the law or section revised or amended shall itself be set forth at full length"; and that, therefore, the entire act is void. This objection cannot be sustained to the extent that it is made. The result of the opinion of the court on this question is, that only that portion of section five, which makes possession an indispensable pre-requisite to the execution of a power of sale given by a mortgage, is foreign to the subject men-

tioned in the title of the act; that the portion thus foreign to the title is void for that reason, if no other; and that the entire act is not, on that account, invalid. We refer to and adopt the opinion and conclusion of the Chief-Justice on this subject.

There being a general concurrence between my brother BYRD and myself, as will be seen by his concise and perspicuous opinion, the following is the result:

That the first and eighth sections of the act are constitutional; (which is in conformity with the decision of the court below;) consequently, the motion for a *mandamus* in the case of *Ex parte* Pollard is refused, and the petitioner must pay the costs of the motion; and that the second section of the act, (upon which sections three and four are dependent,) is unconstitutional; (which is in conformity with the decision of the court below;) consequently, the motion for a *mandamus* in the case of *Ex parte* Woods is refused, and the petitioner must pay the costs of the motion.

BYRD, J.—The case of *Ex parte* Pollard involves the constitutionality of the first section of the act of February 20, 1866.—Pamph. Acts 1865–66, p. 83.

After mature deliberation, my mind has attained the result, that the opinion and conclusions of my brother JUDGE are fully sustained by the adjudications of the supreme courts of the United States, of this State, and of the several States of the Union.

My opinions have long been adverse to the policy and justice of stay-laws.

The act in question is said to be of that class. It is not so styled by the general assembly in the act; and being a co-ordinate of the other two branches of the State government, it is due that we should attribute to it in its action the best motives and objects which can be reasonably presumed, and make every fair intendment in its favor; and after doing so, if we have any well-founded doubt as to the constitutionality of its action, we should give it the benefit of such doubt. This, it is conceived, is the duty of each department, in all cases where one has to pass upon the action of the other.

But for section 6, article vi of the constitution, I suppose no one would doubt the power of the legislature to repeal a law requiring the circuit courts to " be held twice in every year," and by another act to require them to be held once in every year. What is the practical difference in the result of the first section of the act in question and such a law or laws as supposed? In what *legal* sense could such a law be said to impair the obligation of a pre-existing contract?

If the State legislature should abolish all remedies, and provide none, or should provide such as would *barely* leave the remedy worth pursuing, then this court, in my judgment, would be bound, upon principle and authority, to hold such act unconstitutional and void.

The earlier decisions of the supreme court of the United States very clearly drew the distinction between the remedy and the obligation of a contract, and held that a State could not impair the latter, and did not hold that the State could not impair the former. Those decisions left the whole question of remedies to the discretion of State sovereignty. Afterwards, a limitation was engrafted on this doctrine, to the effect that if the remedy was so changed by the State as to make it barely worth pursuing, then such an act would be violative of the Federal constitution.

And now, another limitation is sought to be established by judicial construction and interpretation; and that is, if the remedy is so changed as that, in comparison with the former law, delay is produced in collection of debts, that then the law so postponing the remedy would be obnoxious to the constitutional restriction on the power of the States.

But this limitation has not been, as yet, announced in any adjudication of the supreme court of the United States of which I am aware; and the whole drift of the adjudications of the courts of the several States and of the United States, and especially of this State, as shown in the opinion of my brother JUDGE, being adverse to such a limitation of the power of the States over the subject of remedies, I shall adhere to them, until the Federal court shall engraft such a limitation on its former rulings.

In these times, when the tendency is so apparent toward

the centralization and consolidation of all sovereign powers in the national government, and the consequent absorption of the sovereign rights and powers of the States—perhaps the natural and inevitable result of late public events—it is the duty of the several departments of the State government, while they concede to the national government all powers delegated to it, and such as are necessary to execute them, and yield a cordial and cheerful support to the Federal Union and authorities, to watch with vigilance, but in a spirit of fairness and loyalty to both, every encroachment of the latter, and in the same spirit carefully and sacredly guard every right and power of the former. For both governments were organized by, and for the good of, the people of the whole country.

In this way we may maintain and perpetuate our liberal and benignant system of State and Federal governments and their blessings. A contrary way will, sooner or later, in my opinion, end in disaster, confusion, and, eventually, despotism.

Their security and permanency greatly depend on the preservation, in vigor and harmony, of the rights, powers, duties, and authority of each in its own appropriate sphere, and, *above all*, with them, the rights and liberties of the people.

I am disinclined, in advance of the supreme court of the United States, to participate in making a decision, the effect of which would be further to contract and circumscribe the rights and powers of the States.

If the question under discussion was *res integra*, my mind would incline to the conclusion announced by the Chief-Justice in his very learned and elaborate opinion.

I am satisfied that the bar of the State, and also the people, like myself, are opposed to the policy of the act in question. It delays the collection of debts due the citizens of the State, and has no effect on the collection of debts due citizens of other States, who can sue in the Federal courts. It materially affects the credit system, which in our present condition is a serious injury. But, all these are matters for the consideration of the law-making, and not the law-con-

struing department of the State government. Courts expound constitutions and laws—do not make them.

I concur, on all other qustions, material to the decision of these cases, in the opinion of the Chief-Justice.

A. J. WALKER, C. J.—The validity of the " Act to regulate judicial proceedings," approved February 20th, 1866, is controverted, upon the ground of a want of conformity to the latter clause of the second section of the fourth article of our State constitution. The clause is in the following words: " Each law shall embrace but one subject, which shall be described in the title; and no law, nor any section of any law, shall be revised or amended by reference only to its title and number; but the law or section revised or amended shall itself be set forth at full length." It is contended, firstly, that the law embraces two or more subjects, at least one of which is not described in the title; and secondly, that it revises and amends laws which are not set forth at full length; and that the entire act, if faulty in either of those particulars, is void.

The constitution requires that only one *subject* should be embraced, and that it should be described in the title. *Subject* is a very indefinite word. A phrase may state the *subject* in a very general or indefinite manner, or with minute particularity. The *subject* of laws with such titles as the following, " To adopt a penal code," " To adopt the common law of England in part," " To adopt a code of laws," " To ratify the bye-laws of a corporation," would be expressed in a very general way, and very little knowledge of the specific provisions of the laws could be gleaned from the title; yet it would nevertheless be true that the subject was described in the title. There are different grades of particularity in which the subject of any writing may be designated. Story and Chitty have both written books, the subject of which may in a latitudinous phraseology be denominated Law, or with less generality the Law of Pleading; and still greater precision would be attained by designating Equity Pleadings as the subject of Story's work, and Pleadings in Courts of Law as the subject of Chitty's. It is impossible to prescribe any standard of

particularity for the legislature. The constitution has not attempted to do so. It exacts from the legislature an announcement in the title of the subject, but does not dictate any degree of particularity. This is a matter left to legislative discretion.—*Brewster v. City of Syracuse,* 19 N. Y. 116; *Mutual Insurance Co. v. N. York,* 4 Seld. 241 ; *Bibb Co. Loan As. v. Richards,* 21 Ga. 592. The object of the constitutional provision was to prevent deception by the inclusion in a bill of matter incongruous with the title. The evil contemplated was not the generality and comprehensiveness of titles. Those faults do not tend to mislead or deceive.

There could be devised for the law in question a title which would describe a subject comprehensive and general enough to embrace all parts of the law. A subject might be found, under which every part of the law might be classed. But that does not meet the constitutional requirement. The particular subject selected by the legislature and put in the title must embrace every part of the law. The question must always be, whether, taking from the title the subject, we can find anything in the bill which can not be referred to that subject. If we do, the law embraces a subject not described in the title. But this conclusion should never be attained, except by argument characterized by liberality of construction and freedom from all nice verbal criticism.

The law in hand is not inconsistent with the constitution because it embraces in the different sections various and distinct plans for the regulation of judicial proceedings. We take the " subject " as it is in the title, and we find everything in the law falling within the comprehensive limits of the one general subject described, except a part of the fifth section, which relates to mortgages and deeds of trust· That section prohibits sales by mortgagees without actual possession of the property. This is not a regulation of judicial proceedings. It produces a necessity for a resort to judicial proceedings, if possession is not voluntarily yielded, but it in no wise contributes to the regulation of those proceedings.

The latter part of this section, which declares that the

trustee or creditor after default shall have an action at law, and that the rules as to bond, affidavit, &c., in detinue cases, shall apply to suits for personal property, may perhaps, by a very liberal definition of "judicial proceedings," be regarded as coming under the title. It is not, however, necessary to determine this point. A part of the law is certainly alien to the subject described in the title; and thus the question arises, whether the inclusion of the second subject vitiates the whole law, or only affects the incongruous matter. The response to that question is, that if matter foreign to the subject is divisible from that which falls within the title, and the latter can stand and have effect without the former, then only so much of the act as is not embraced by the title is void. This conclusion is sustained by the authorities, and harmonizes with the intention of the constitution to prevent the incorporation into laws of matter incongruous with the title, and effectuates such intention.

The law is not void because it amends or revises other laws. It only repeals laws contravening its provisions. This is nothing more than a repeal of laws in irreconcilable conflict. Its effect is analogous to a repeal by implication. It was never intended by the constitution that every law which would affect some previous statute of variant provisions on the same subject should set out the statute or statutes so affected at full length. If this were so, it would be impossible to legislate. The constitutional provision reaches those cases where the act is strictly amendatory or revisory in its character. Its prohibition is directed against the practice of amending or revising laws by additions, or other alterations, which without the presence of the original are usually unintelligible. If a law is in itself complete and intelligible, and original in form, it does not fall within the meaning and spirit of the constitution.—*Com. v. Drewry*, 15 Grattan, 1. The constitution of Maryland is identical with ours on the subject, and the view above presented is fully sustained in that State.—*Davis v. State*, 7 Md. 151; *Parkinson v. State*, 14 *ib.* 18–21; Sedgwick on Stat. & Con⋅ Law, 27.

Almost all the points above stated, in reference to the

conformity of the law in its title to the constitution of the State, have been adjudicated in other States, where similar constitutional provisions are found. In California it is held, that those provisions are merely directory to the legislature. The other decisions will be found generally in harmony with the views above expressed. We refer without comment to cases.—*Walker v. Caldwell,* 4 La. 297; *State v. Walker,* 5 *ib.* 91; *Duverge v. Salter, ib.* 94; *Succession, &c. v. Lanzetti,* 9 *ib.* 329; *State v. Harrison,* 11 *ib.* 22; *Bossier v. Steel,* 13 *ib.* 432; *Rogers v. State,* 6. Ind. 31; *Washington v. Page,* 4 Cal. 388; *Pierpont v. Crouch,* 10 *ib.* 315; *L. & C. T. R. R. v. Ballard,* 2 Ky. 165; *Phillips v. Covington & C. Br. Co., ib.* 219; *Robinson v. State,* 15 Texas, 311; *Brewster v. City,* 19 N. Y. 116; *Sun M. J. & Co. v. Mayor, &c.* 4 Seld. 241; *Sharp v. Mayor,* 31 Barb. Sup. Ct. R. 572.

The question of the constitutionality of the 5th section of the law only springs up incidentally in the argument on the point urged before us, that the law embraced a subject outside of the title, and that the entire act was therefore void. We therefore have not been called upon to decide whether the 5th section is void as impairing the obligation of contracts, and we do not wish to be understood as asserting its validity in that point of view, because we have considered another objection to it.

I now proceed to consider the question, whether the first and eighth, and the second, third and fourth sections of the act, impair the obligation of contracts, and are, therefore, violative of the provisions of the State and Federal constitutions upon that subject. After a careful examination of the subject, I feel an undoubting conviction that all of these sections will have the effect of impairing the obligation of pre-existing contracts, and I must so decide.

The obligation of a contract consists in its binding force. It is that which obliges a party to its performance. The law therefore which requires the performance of a contract has been held to be its obligation; and I adopt this definition, without entering into the refinements of argument which have been indulged as to the import of obligation in the constitution.—*Sturges v. Crowinshield,* 4 Wheat. 197; *McCracken v. Hayward,* 2 How. 612. The law obliges

the performance of an act stipulated at the time specified in the contract. The obligation extends to the time of performance, and a law which dispenses with the payment of money at the appointed time as certainly and clearly infringes the constitution, as if it declared the debt void. There is, indeed, ground for the supposition that the prohibition of the constitution was specially aimed at legislation which delayed the payment of debts, because such legislation was the subject of great complaint about the time of the adoption of the constitution.—4 Wheat. 197–205–207.

The prohibition of the constitution is to the *impairment* of the obligation. This must not be confounded with destruction. Health may be impaired, and yet not destroyed. So may the obligation of a contract. The obligation is impaired when it is made worse—diminished in quantity, value, excellence, or strength. "The objection to a law that it impairs the obligation of a contract can never depend upon the extent of the change which the law effects in it." Any deviation from its terms, by postponing or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with those which are, however minute, or apparently immaterial in their effect upon the contract of the parties, impairs its obligation.— *Green v. Biddle*, 8 Wheat. 84. One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not by the constitution to be impaired at all; this is not a question of degree, or manner, or cause, but of encroaching in any respect on its obligation, or dispensing with any part of its force. *Planters' Bank v. Sharp*, 6 Howard, 327.

The legislature has no independent and original authority to postpone for a single day the payment of a debt. The obligation to pay at the stipulated time is absolutely excepted from legislative authority.—*Commercial Bank v. Mississippi*, 4 Sm. & Mar. 507 ; 2 Story on Const., § 1385 ; *Ogden v. Saunders*, 12 Wheaton, 327 ; *Golden v. Prince*, 3 Wash. Cir. Ct. R. 319.

As the legislature cannot directly impair the obligation, *a fortiori* it cannot by indirect means. In the language of Chief-Justice Marshall, "the principle in the contempla-

tion of the framers of the constitution was the inviolability of contracts, and this principle was to be protected in-whatever form it might be asserted."—*Sturges v. Crowninshield*, 4 Wheat. 200.

I admit that it is in the province of the legislature to provide remedies for the enforcement of contracts, and that it may make modifications and changes of those remedies, adjusting them according to its view to the attainment of fair judicial investigation, correct administration of justice, and the just and equable execution of judgments. I admit, also, that delay is unavoidably incident to every remedial agency which can be provided, and that the legislature is not restricted from making changes in remedies merely because some increased delay may result. This retardation in compelling the performance of contracts is tolerated, not because there is any direct legislative authority over the subject, but because there is a right to regulate the remedy, and some delay is unavoidably incident to the exercise of that right. There must be some limitation on this authority over the remedy; otherwise the prohibition of the constitution, from mere facility of evasion, is utterly ineffective. It is a doctrine of universal acceptation, frequently announced by the supreme court of the United States, that legislation professedly upon the remedy may assume such a character as to impair the obligation of the contract. Between regulations of the remedy, which, though they may in some cases affect contracts, are permissible, and those which impair the obligation, there is a shadowy and undefined line of demarkation. Unable to define this line, the judicial mind must decide in each case, whether the law falls on the one side or the other of it. In doing this, however, the guidance of principle must be sought. The principle which, in my judgment, should govern in such inquiry, is this: when a change or modification of remedy is clearly disclosed by the machinery provided, and by the necessary operation and effect, to be no real adaptation of the remedy to the ends of justice, and not to be adapted to contribute to those ends, and to be a mere device for delaying the performance of contracts, it is unconstitutional, because it impairs the obligation of contracts. This prin-

ciple is an inevitable deduction from the indisputable proposition heretofore stated, that there is no legislative authority over the obligation of contracts, and the toleration of its touching that obligation injuriously to the slightest extent is based entirely upon the fact that such effect is necessarily incident to the government of the remedy. The legislature can not elevate that which is tolerated only as an incident into a principal motive of action. It can not make delay the object of legislation; and when it shapes its changes in remedies for the accomplishment of that object, it transcends its authority. Whenever it can be clearly ascertained from the law that it has done so, it is, in my judgment, a judicial duty to declare the law unconstitutional, no matter under what plausible guise the purpose may have been covered, or by what high considerations of patriotism or benevolence the legislature may have been influenced. If a *perceptible* departure of the slightest extent from the appointed sphere of changing the remedy for its amelioration as a remedy, and a *perceptible* interference to delay the performance of contracts, in violation of their stipulations, *for the sake of delay*, and not resulting incidentally, are sanctioned, then there is no practical restraint upon the legislature. The constitutional prohibition must always fall before the ingenuity of legislative contrivance. There is no principle which would tolerate the passage of the line of demarkation one step, and there arrest the legislature. If the performance of the contract can be delayed for the sake of delay one day, there is no principle which negatives the power to delay for twenty years.

While the legislature can not make laws for the mere purpose of delaying the performance of contracts, it may accelerate the remedy, because, in proportion as the coercion of immediate performance of stipulations is approximated, the sanctity of contracts is sustained and cherished, and the purpose of the constitution preserved.

For authority on this subject, we should look to the decisions of the supreme court of the United States; for, as to the present question, that court is to us an appellate tribunal, and it is our duty to adopt its doctrines and make our decisions quadrate with them. An examination of some

of those decisions will, I think, show that the views I have just expressed scarcely go to the extent which the principles announced in them would justify. Chief-Justice Marshall, in *Sturges v. Crowninshield*, (4 Wheat. 122,) remarked, that without impairing the obligation of a contract, the remedy might certainly be modified as the wisdom of the nation might direct. The opinion in that case is not characterized by the author's accustomed clearness and definiteness of expression, and the explanation, perhaps, is, that the judgment in the case was the result of a compromise among the members of a divided court.—Opinion of Justice Johnson, in *Ogden v. Saunders*, 12 Wheat. 272. Chancellor Kent twice, in his commentaries, disapproves and regrets, as tending to mislead, the "general and latitudinary manner" of the remark I have quoted; (1 Kent's Com. m. p. 419, n. *a*, m. p. 456, *d*;) and another eminent writer joins in the criticism—Sedgwick on S. & C. Law, 643, 644. The remark of Chief-Justice Marshall was not designed to claim for the legislature an unlimited control over the subject of remedies, without regard to the obligation of the contract. More guarded announcements upon the subject were afterwards made by the supreme court of the United States. In *Green v. Biddle*, (8 Wheat. 17,) Judge Story held, that laws which so change the remedy as to materially impair the rights and interests of the party, violate the constitution. In *Ogden v. Saunders*, (12 Wheat.) Mr. Justice Johnson, while repudiating the doctrine that the remedy must be regarded as grafted in the contract, proceeds to say, (p. 284,) "Yet I freely admit that the remedy enters into the views of the parties when contracting; that the constitution pledges the States to every creditor for the full, and fair and candid exercise of State power to the ends of justice, according to its ordinary administration, uninfluenced by views to lighten, or lessen, or defer the obligation to which each contract fairly and legally subjects the individual who enters into it." And Mr. Justice Trimble, in the same case, said, (p. 327,) "Whether the law professes to apply to the contract itself, to fix a rule of evidence, a rule of interpretation, or to regulate the remedy, it is equally

7

within the true meaning of the constitution, if it in effect impairs the obligation of the contracts."

Tracing in the order of their occurrence the most prominent decisions of the supreme court of the United States, we come next to *Bronson v. Kinzie*, (1 Howard, 311.) It was there held, that a law which authorized a redemption within twelve months, of property sold under a decree of foreclosure, and also a law prohibiting sales in such cases for less than two-thirds of the appraised value, violated the constitution. The court admitted, and illustrated by examples, the power of a State over the remedy, with the qualification, that the obligation of the contract should not be impaired, and that if such an effect should be produced, it was immaterial whether it should be done by acting on the remedy, or on the contract itself. The court further says, the remedy "is the part of the municipal law which protects the right, and the obligation by which it enforces and maintains it. It is this protection which the clause in the constitution mainly intended to secure. * * * And it would but ill become this court, under any circumstances, to * * * sanction a distinction between the right and the remedy, which would render the provision illusive and nugatory; mere words of form, affording no protection, and producing no practical result." This opinion is elevated in its dignity and authority as a guiding judicial precedent, because, although it was at the time assailed by Mr. Justice McLean, in a dissenting argument of great power, it has ever since been recognized and asserted as a correct exposition of the law, without the slightest manifestation of opposition to it. *McCracken v. Hayward*, 2 How. 698; *Grantley's Lessee v. Ewing*, 3 How. 707; *Curran v. State*, 15 *ib.*; *Howard v. Bugbee*, 24 *ib.* 261; *Hawthorne v. Califf*, 2 Wallace, 10. By looking into these later cases, we find the construction which the court has put upon *Bronson v. Kinzie.*

*McCracken v. Hayward* involved the constitutionality of a law of Illinois, prohibiting execution sales for less than two-thirds the appraised value of the property. The court, Justice Baldwin being its organ, said: "The obligation of the contract between the parties in this case was to perform the promises and undertakings contained therein; the right

of the plaintiff was to damage for the breach thereof, to bring suit and obtain a judgment, to take out and prosecute an execution against the defendant until the judgment was satisfied pursuant to the existing laws of Illinois. These laws giving these rights were as perfectly binding on the defendant, and as much a part of the contract, as if they had been set forth in the stipulations in the very words of the law relating to judgments and executions. If the defendant had made such an agreement as to authorize a sale of his property, which should be levied on by the sheriff, for such price as should be bid for it at a fair public sale, on reasonable notice, it would have conferred a right on the plaintiff which the constitution made inviolable; and it can make no difference whether such right is conferred by the terms or the law of the contract. Any subsequent law which denies, obstructs, or impairs this right, by superadding a condition that there shall be no sale for any sum less than the value of the property levied on, * * * to be ascertained by appraisement or any other mode of valuation than a public sale, affects the obligation of a contract as much in the one case as the other; for it can be enforced only by a sale of defendant's property, and the prevention of such sale is the denial of a right." This decision is professedly a reassertion of the doctrine of *Bronson v. Kinzie.* So, also, the court unanimously asserted the same doctrine in the later case of *Grantley's Lessee v. Ewing, (supra,)* in the following words: "This court held in *Bronson v. Kinzie,* that the right, and a remedy substantially in accordance with the right, were equally parts of the contract." The tendency of the supreme court of the United States, as indicated in the view above presented, has been, in the progress of its decisions, to narrow the limits of State authority in reference to contracts. In the two cases last noticed, the position was at least very closely approximated, that the remedy is a part of the contract; but I do not think, and, therefore, do not claim, that the court designed to go to that extent. It is, however, very fully maintained in the cases which I have brought to view, that State laws shaping the remedy so as to impair the obligations of contracts are void; that the constitution pledges the State to every creditor for the

full, fair and candid exercise of State power to the ends of justice, uninfluenced by views to lighten, or lessen, or defer the obligation ; that the clause of the constitution in question was mainly designed to secure a remedy which protects the right, and that a remedy in accordance with the right is part of the contract. It would be the grossest absurdity to say, when a legislature has passed a law changing the remedy so as to postpone the performance of contracts, and delay the payment of debts, without regard to improving and bettering the remedy, that it has satisfied the pledge imposed by the constitution to legislate fairly and candidly for the ends of justice, without any view to defer the obligation ; or that the object of the constitution, to secure a remedy which protects the right of payment according to the contract, has been attained ; or that a remedy in accordance with the right, as to the time of performance, has been provided. On the contrary, in such a case it is clear, that such legislation opposes and thwarts those rights which the constitution designed to secure.

I come now to apply the principles and authorities above stated to the question as to the constitutionality of the 1st, 8th, 2d, 3d, and 4th sections of the law. The contracts in both the cases before us were made before the passage of the act. The validity of the law is therefore to be tested in its operations on antecedent contracts, and all the principles which I have announced apply only to the law as it affects antecedent contracts. The question as to the validity of the law in reference to subsequent contracts, which could be presumed to have been made in reference to it, would be entirely different.

Do the first and eighth sections of the law impair the obligation of contracts? Before the adoption of this act, a creditor, by obtaining the service of his summons twenty days before the court, had a right to demand a judgment at the first term, and could have obtained it, unless his case was continued for some reason sufficient in the estimation of the presiding judge. The first section of the law forbids the rendition of judgment until the third term after the service of the summons. It denominates the first a return term, and the second an appearance and pleading

Ex parte Pollard, Ex parte Woods.

term, and declares that no trial shall be had until the next term after the appearance and pleading term. In the circuit court, a delay of twelve months at least is effected, for the terms by the constitution are semi-annual. In the several city courts, the terms, at the third of which a trial may be had, are by section eight required to be six months apart; so that the period of twelve months at least in these courts must expire before a judgment can be asked. The creditor is not permitted to ask a judgment at the first or the second term. I can find no other conceivable purpose of this regulation, except to prevent the enforcement of a contract. This is not only its obvious purpose, but its effect. The law by its mandate requires this delay, although there may be no defense, no appearance, and even though there may be a confession of the cause of action. What adjustment of the remedy to the attainment of justice, what safeguard for a fair trial, what convenience, or opportunity for a fair trial, what convenience, or opportunity for the procurement of testimony, what economy of expense, is consulted, in delaying to the third term, by an unvarying rule in all cases, irrespective of their exigencies, and especially in cases where there is no defense or a confession of the cause of action? Where there is no defense, no appearance, no evidence, and no trial, the object of justice is attained by the simple entry of judgment. That is the remedy, and that is all of it as far as the court is concerned. When the court is forbidden to enter judgment until the third term in such cases, the effect is not to regulate any remedy for the administration of justice. It is simply to stop the machinery by which justice can be obtained. The plaintiff remains with folded hands for at least twelve months, without his remedy by judgment, and that too when the delay is not incident to preparation for a trial. Where there is a real ground of litigation, the argument may be less striking, but it is equally correct. The postponement is not predicated of any difficulty of pleading, or of procuring evidence, or any peculiarity in the condition of the defendant, such as absence, sickness, or service in the army, which might produce delay in the preparation for trial. There is an unvarying, undiscriminating rule of

delay, without reference to the demands of justice.   Proceedings in admiralty, actions of detinue, and of forcible entry and detainer, and forcible detainer, are excepted from the operation of the law.   These actions belong to the class usually litigated, and would certainly have been embraced, if affording a proper opportunity for the preparation of pleading and evidence had been in contemplation.   Why is it that in the city courts, which are held oftener than twice a year, that the term next after the return term is not the pleading term?   Why skip that term, and make the third term the pleading term?   The answer is obvious— an intervention of less than six months between the terms would not accomplish the purpose of delay, and hence it is required that periods of six months shall intervene between the courts within the plan of the law.   Every one is bound to see and admit that the first and eighth sections establish a mere plan for the delay and postponement of the performance of contracts, and do not adjust the machinery of courts to the attainment of a fair trial, or to the security of justice.   Under the principles which I have laid down, and I think sustained, such provisions violate the constitution.

In an opinion delivered in 1858, in *Bugbee v. Howard*, (32 Ala.,) I intimated the belief that the legislature, from considerations pertaining to the police and economy, and the general welfare of the State, might modify its remedies so as to afford relief, where from unexpected and sudden revolutions, and disasters in trade and commerce, or from war, or any other cause, a general and extended sacrifice of property by forced and unqualified sales under process, giving rise to pauperism, destitution, and the deprivation of the means of a comfortable subsistence, would otherwise result.   I regret that I now feel no assurance of the correctness of this intimation.   My opinion has been overruled by the supreme court of the United States, which reversed the decision of this court.   I can perceive no ground upon which the convictions of the legislature as to the welfare of the people can enlarge the authority to interfere, through the manipulation of the remedy, with the obligation of contracts.

The constitution throws over the authority to provide for

the general welfare the qualification that the obligation of contracts must not be impaired. We have seen that laws which make sales under execution subject to redemption within twelve months, and prescribe that sales shall not be made for less than one-half or two-thirds the appraised value, can not be constitutionally applied to pre-existing contracts. These laws certainly contribute less to prevent the enforcement of a contract according to its stipulations, than a law which closes the door of the tribunal of justice, at two successive terms, to one who has instituted a suit, and invokes the power of the law to enforce the obligation of his contract; and they as clearly have their origin in a conviction of the legislature as to what was demanded by the public good and the necessity of debtors. Guided by the decisions in reference to those laws, I can not conclude that the provisions contained in the first and eighth sections are constitutional. But upon this point my brethren differ from me, and my opinion is not the opinion of the court. I attain my conclusion with reluctance, and after a concession that my decision should be different if I doubted upon the subject. It is always a duty to sustain the constitutionality of laws, when the question is regarded as doubtful; and that is peculiarly the case when the point to be determined is whether the legislature has passed the undefined boundary between a legitimate regulation of a remedy, and one which impairs the obligation of a contract. To borrow an illustration, this boundary is like that which divides night from day: it can not be determined precisely when it is passed, and yet there are times when it is safely affirmed to be night or day. When a law is in the twilight of uncertainty, intervening between clearly valid and clearly void legislation, the judicial mind must doubt, and should sustain the law. If I thought such to be the character of the provisions now under examination, I should sustain them.

The legislation of this State affords precedents for the delay of judgment to the second term, but there is no precedent for such postponement as is provided by this law. The toleration by the legal sentiment of the State of a law postponing to the third term can not be argued from its toleration of a law postponing to the second term, for

every increase of delay develops and manifests more clearly the interference with contracts. Where an advance has been made to doubtful ground on the brink of a precipice, the safety of another step in the same direction can not be argued from the safety of the steps already taken.

My brethen concur with me in the opinion that the 2d, 3d, and 4th sections of the law, affecting the collection of judgments, are unconstitutional, in so far as they concern judgments on pre-existing contracts.

The 2d section withholds all interference with a plaintiff having a judgment, until he sues out an execution and places it in the sheriff's hands, and until the sheriff has made a levy. But, when a levy has been made, it allows the process of collection to be stopped, and it prescribes the mode of proceeding by which it is to be stopped. Professedly, the proceeding is to be stopped for the purpose of affording a remedy to the defendant against some irregularity or illegality in the execution, or in the proceeding under it. It is a significant characteristic of this remedy, that it is confined to defendants upon whose property a levy has been made, and is not available to any person against whom there is an execution full of illegality or irregularity, without a levy. This has rather the appearance of a feature of law to prevent the collection of money, than of one to provide a needed remedy. It operates only where it is necessary to prevent the making of money. But how is the process of execution to be stopped? The defendant, upon whose property a levy has been made, may suggest in writing to the sheriff that there is some irregularity or illegality in the execution, or in its issue, or in the proceedings under it. No affidavit, not even an affirmation, is required. It is not necessary to show in what the irregularity or illegality consists. No evidence of the truth of the suggestion, or of its correctness in point of law, is necessary. It is sufficient that the suggestion is made; no matter though it be a mere pretense, unfounded in fact, and unfounded in law. The defendant may then pay the costs, except sheriff's commissions, and, if personal property is levied on, give bond, in double its value, conditioned to deliver the property to the officer, or pay its

Ex parte Pollard, Ex parte Woods.

value, if the suggestion should be decided adversely to him. When the levy is upon real estate, no bond is required. These things being done, the execution is superseded, and must be returned. The execution may be superseded upon suggestion, when there is really not the slightest ground of objection to it. The suggestion of mere irregularities of the sheriff in his proceedings under the execution, which can not vitiate the process itself, is made a legal reason for *supersedeas*. The plaintiff is deprived of his execution, without any security or indemnity. The bond is only in double the value of the property, no matter how small that may be, and, besides, may be discharged by the delivery of the property, if the suggestion is decided against the defendant. Thus, even though the defendant has made a false suggestion, he is rewarded by the possession of the property until the trial, and the plaintiff is certainly in no better condition than when the execution was returned. Although there may be several defendants, and a suggestion of illegality or irregularity only as to one, and not affecting the others, the execution must be returned stayed as to all by suggestion. The stoppage of the execution, as to the defendants not making the suggestion, is an interference to prevent the performance of a contract, not even disguised by the semblance of the regulation of remedy. Upon the return of the execution to the next term of the court, with the endorsement "stayed," the 3d section interposes, and says to the plaintiff, you shall not have a trial at this term without the defendant's consent, but the case shall be continued for six months. This continuance is a mandate of the law, even though the suggestion may be contradicted by the record, or be altogether insufficient in law. At the next term of the court, the 4th section, in contravention of the party's right to the payment of the entire debt, interposes, and prohibits a judgment, if the defendant will pay the costs and one-third of the debt and interest. But the operation of these provisions in preventing the collection of judgments does not stop here. After the plaintiff has gotten rid of the suggestions at the end of this long process, and sues out a new execution, he may be again stopped by a new sugges-

tion, and the same dilatory proceedings may be had; for whenever a levy is made, the execution may be stayed by suggestion; and thus the proceedings to make the money due by judgment, however industriously prosecuted, may proceed in a circle never to end in success. Such provisions as the 2d, 3d, and 4th sections of the law, so obviously pervert the remedy to the impairment of the obligation of contracts, and so obviously fall under the influence of the principles established by the supreme court of the United States, that it cannot be necessary to argue the subject. Those provisions render the remedy for the collection of judgments by execution hardly worth pursuing, and their validity can not be maintained for one moment under the decisions in *Bronson v. Kinzie*, and *McCracken v. Hayward*. They impair the obligations of contracts, and are void.

I do not deny that the legislature, in passing this law, was actuated by the purest and noblest motives. I concede that the condition of our oppressed and impoverished people appeals strongly to the sympathies of every good man. I do not deny that the policy of the law may be wise and good, though, upon this subject, it is not my province or purpose to express any opinion. Nevertheless, the legislature has, in my judgment, undertaken to do what the constitution does not permit; and, thinking as I do, I can preserve my sense of judicial integrity only by deciding as I have done. I make the decision with pain and regret, but I have no election.

NOTE BY THE REPORTER.—At a subsequent day of the term, on petition for rehearing by the counsel of Pollard, the following opinion was delivered:

A. J. WALKER, C. J.—The petition for a re-hearing invites the court to a re-examination of the validity of the act "to regulate judicial proceedings," approved February 20th, 1866. The petition is made upon the apprehension that the different members of the court may not have considered the effect of the 14th section of the 1st article of the State constitution, with the care which it merits. That

section is in the following words : "All courts shall be open; and every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due course of law, and right and justice administered without sale, denial, or delay." This constitutional provision is designed to guaranty the administration of right and justice without delay, in actions *ex delicto*, as well as *ex contractu*, and in favor of defendants as well as plaintiffs. This guaranty is more extensive in the class of cases affected by it, than that which prohibits the making of laws impairing the obligation of contracts. But, so far as actions *ex contractu* are concerned, the question of the constitutionality of the law is the same, whether the test of the provision as to the delay of right and justice, or that as to impairing the obligation of contracts, is applied. Under either test, there is a right in the legislature to regulate the remedy, and all legislation which is truly a regulation of the remedy is valid. The question which is so elaborately discussed, in the opinions already delivered, controls the point to the more special consideration of which we are invited by the petition for a re-hearing. This view was entertained by us when our opinions were prepared ; and therefore but little attention was given to the point in those opinions. The granting of a re-hearing, upon the question suggested, would simply bring up a re-examination of the principles announced in our respective opinions already delivered. Each one of us is content to abide by the doctrine already announced by him. We think, therefore, the granting of a re-hearing could be of no profit. The questions of the case are of the highest importance, both on account of their intrinsic character, and on account of the variety and extent of interests, and the number of persons affected by them. We have, therefore, been solicitous to draw information and receive argument from every proffered or attainable source, and would gladly avail ourselves of the further discussion which counsel would make ; but the questions would be the same which we have already considered, and we have given them the most elaborate and careful consideration and the most prolonged discussion among ourselves ; and the state of our respective convictions would not, in our belief, be changed

by a new argument. We therefore respectfully decline to grant the petition for a re-hearing, and this response has the concurrence of each member of the court.