[No. 24601. *En Banc.* April 2, 1934.]

THE STATE OF WASHINGTON, *on the Relation of Mason County Logging Company, Appellant,* v. R. A. WILEY, *as Assessor for Grays Harbor County, et al., Respondents.*[1]

[1]Reported in 31 P. (2d) 539.

*W. H. Abel* (*T. H. McKay,* of counsel), for appellant.
*E. E. Boner,* for respondents.

GERAGHTY, J.—The 1931 session of the legislature enacted chapter 40, known as the reforestation act. Section 1 of the act (Laws of 1931, p. 117) is declaratory of its purpose, and follows:

"Public welfare demands that steps be taken to encourage reforestation and to protect and promote the growth of new forests on lands chiefly valuable for that purpose in order that they may be restored to the economic and industrial life of the state. To accomplish that end it is necessary that a system of taxation and assessment be devised for such lands, which will encourage the growth of new and immature forests on lands chiefly valuable for that purpose, and which will enable the owners thereof to bear the burden of taxation on such lands over the period of years necessary to produce forests of commercial value. Therefore the State of Washington, through its legislature, hereby exercising its police and sovereign power, declares and enacts that all logged-off lands and all unforested lands chiefly valuable for the production and growth of forests and all lands growing immature forests and forests of no commercial value shall not be assessed or taxed at a rate which will discourage or hamper the

growth of forests on such lands, but shall be assessed and taxed at such rate and in such manner that owners of such lands may be encouraged to reforest, protect and grow forests of commercial value on such lands." Rem. Rev. Stat., § 11219-1.

In furtherance of this purpose, the act sets up a comprehensive plan for the classification, taxation and management of lands chiefly valuable for the development and growth of forests. In relation to the taxation of such lands, the plan adopted embodies two elements: (1) Reforestation lands are to be carried upon the assessment rolls of the counties in which they are situated at a valuation fixed in the act; and (2) a yield tax equal to $12\frac{1}{2}$ per cent of the market value of the timber or forest crop cut from the land, is to be assessed and taxed against the owner by the county assessor as the crop is cut. All taxes collected under the provisions of the act are to be paid to the county treasurer of the county in which the lands are situated and by him distributed to the various funds in the same proportions as general taxes on other property in the same taxing district. The act provides for the classification of reforestation lands by the state forest board after hearing, and the certification by the board of the lands so classified to the assessor of the county in which they are situated.

Section 7 of the act (Laws of 1931, p. 124) is as follows:

"All lands classified as reforestation lands as provided in this act and lying west of the summit of the Cascade range of mountains in the State of Washington shall, after the date of such classification, be assessed for purposes of taxation at one dollar ($1.00) per acre, which is hereby declared to be the assessed value thereof; and all lands so classified lying east of the summit of the Cascade range of mountains shall be assessed for purposes of taxation at fifty cents (50c) per acre, which is hereby declared to be the assessed

value thereof. The above values shall apply as the actual basis for taxation of such lands, without regard to any percentages of value which may apply for taxation of other classes of property; and the taxation of such lands on the basis herein provided shall be separate and distinct from and in addition to the cost of protecting such lands from fire as provided under the laws of Washington." Rem. Rev. Stat., § 11219-7.

Proceeding under authority of the act, the state forest board classified certain lands in Grays Harbor county owned by the Mason County Logging Company as reforestation lands, and certified them to the assessor of Grays Harbor county to be spread upon the assessment rolls of the county. The assessor refused to spread the lands upon the assessment rolls at the valuation fixed by the provisions of § 7, and, instead, proceeded to assess them for taxation purposes at values fixed by himself and higher than the statutory rate. Thereupon, the logging company instituted an action for a writ of mandamus to compel the assessor to follow the legislative mandate. Later, the treasurer and commissioners of Grays Harbor county were made parties to the action. The trial court sustained a demurrer to the relator's amended complaint, upon the ground that § 7 of the reforestation act was unconstitutional, in that the legislature was without power to fix the valuation of the lands for purposes of taxation, as provided in the section. The relator declining to plead further, judgment was entered dismissing the action. This appeal follows.

Chapter 40 of the 1931 Session Laws, p. 117, was enacted pursuant to the terms of the fourteenth amendment to the state constitution, adopted by the people of the state at the 1930 general election. The fourteenth amendment repealed §§ 1, 2, 3 and 4, of article VII, of the constitution, and substituted in lieu thereof the following:

"The power of taxation shall never be suspended, surrendered or contracted away. All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax and shall be levied and collected for public purposes only. The word 'property' as used herein shall mean and include everything, whether tangible or intangible, subject to ownership. All real estate shall constitute one class: *Provided, That the Legislature may tax mines and mineral resources and lands devoted to reforestation by either a yield tax or an ad valorem tax at such rate as it may fix, or by both.* Such property as the Legislature may by general laws provide shall be exempt from taxation. Property of the United States and of the state, counties, school districts and other municipal corporations, and credits secured by property actually taxed in this state, not exceeding in value the value of such property, shall be exempt from taxation. The Legislature shall have power, by appropriate legislation, to exempt personal property to the amount of three hundred ($300.00) dollars for each head of a family liable to assessment and taxation under the provisions of the laws of this state of which the individual is the actual bona fide owner."

For the purpose of reference, we have italicized that part of the amendment with which we are concerned here.

Repealed §§ 3 and 4 of article VII provided for the taxation of corporate property. Sections 1 and 2 provided for the taxation of all property in the state not exempt, in proportion to its value in money, so that every person and corporation should pay a tax in equal proportion to the value of his, her or its property.

In the language of this court in *State ex rel. Atwood v. Wooster,* 163 Wash. 659, 2 P. (2d) 653, by the amendment,

" . . . the requirements that a uniform tax be assessed against all property were swept away, and in their place were adopted constitutional provisions

which say nothing about uniformity, and do not provide that all property shall be taxed, but which do permit of the classification of all property, and provide that all taxes shall be uniform upon the same class of property, and also that such property as the legislature may provide shall be exempt from taxation. So that the legislature, freed from the former limitations, may now determine what property shall be taxed, the different rates upon which different classes of property shall be taxed, and what property shall pay no tax at all, subject only to the limitations found in the new constitutional provisions.''

It is a matter of common knowledge that the purpose of the fourteenth amendment was to permit a departure from the rigid requirement of uniformity and equality, making it possible to classify different kinds of property and levy different rates according to classes, to the end, largely, that the classes of property known as intangibles might be taxed at rates low enough to offer no inducement for concealment or evasion. While the rule prescribing general uniformity regardless of class of property was abolished by the amendment, uniformity is still required within the classes.

The amendment upon its face indicates another purpose in its enactment, and a special exception from the rule of uniformity, in the proviso relating to the taxation of mines and mineral resources and lands devoted to reforestation. The amendment provides that real estate shall compose one class, and then by a proviso lifts out of that class mines and mineral resources and lands devoted to reforestation, and provides for their special treatment as a distinct sub-class.

The trial court reached the conclusion that the net result of the proviso was no more than to make available to the legislature an additional method for the taxation of reforestation lands, namely, the yield tax;

and that the reference to an *ad valorem* tax is not intended to confer any additional power, but is merely explanatory in the relation in which it is used.

At the outset, it will be observed that the challenged act is one highly remedial, having for its purpose the conservation and development of a basic resource of the state. We are aware that the problem of our vanishing forests and the reforestation of the vast areas from which the timber has already been removed has challenged the attention, not only of the people of this state, but of the nation; and everywhere efforts are under way, through plans for a more orderly harvesting of timber crops and the planting of denuded areas, to remedy, in part at least, the wasteful practices of the past.

The act before us is the well-considered and deliberate result of the consideration given to the problem by the legislature. It comes before us with every intendment in its favor, and nothing less than a certain and unequivocal violation of some constitutional inhibition can warrant us in holding it inoperative.

In the consideration of the reforestation proviso of the fourteenth amendment, much space is given in the briefs of the parties to a discussion of the technical meaning of the words "*ad valorem*" and "rate." Now, constitutions are not written in technical language, and simplicity and brevity have always been ends sought in drafting them. As this court has said on other occasions, it is a cardinal rule of construction that the language of a constitution is to be taken in its general and ordinary sense, and when words are used in a constitution which have both a restricted and a general meaning, the general must prevail over the restricted, unless the nature of the subject matter or the context indicates that the limited sense was intended.

*Bronson v. Syverson,* 88 Wash. 264, 152 Pac. 1039, Ann. Cas. 1917D, 833, L. R. A. 1916B, 993. Upon this point, Judge Story, in his work on the Constitution, says:

"Every word employed in the Constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common-sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." 1 Story, Constitution (5th ed.) 345, § 451.

In *Epping v. Columbus,* 117 Ga. 263, 43 S. E. 803, the supreme court of Georgia, in construing the word "debt," as used in the constitution of that state, said:

"The law deals at all points with the man of ordinary prudence and average capacity as the standard, for the simple reason that communities and commonwealths are made up of persons of this class. Constitutions are adopted by commonwealths so made up, and the meaning to be given to such instruments is that meaning which the man of ordinary prudence and average intelligence and information would give. Generally the meaning given to words by the learned and technical is not to be given to words appearing in a constitution. In other words, the popular meaning is to be given to the words of a constitution, unless the context or the instrument taken as a whole imperatively requires some other meaning. Before the words can be given a purely technical meaning which would be different from the popular meaning, the intention that they should be so understood must be plainly apparent and palpably manifest."

As we read the proviso, the key to its interpretation—if interpretation is needed—is the word "rate." The word has various meanings, dependent upon its relation to subject matter and context. It may mean measure, valuation, proportion or percentage. In relation to taxation, it is used in the sense of valuation or percentage. *State ex rel. Mut. Ben. Life Ins. Co. v. Utter,* 34 N. J. Law 489; *Coventry Co. v. Assessors,* 16 R. I. 240, 14 Atl. 877; *Lake County v. Schroder,* 47 Ore. 136, 81 Pac. 942; *Ankeny v. Blakley,* 44 Ore. 78, 74 Pac. 485. We think the word is used here in the sense of both valuation and percentage. It is the manifest purpose of the fourteenth amendment, by the proviso, to leave with the legislature the fullest power of taxation by either or both of the two methods possible, a tax upon yield or upon value, at such rate —expressed in terms of value or percentage—as it may fix.

In construing the proviso, it is to be borne in mind that the legislature possesses inherently a plenary power in the matter of taxation, except as limited by the constitution. No constitutional grant of the taxing power is needed. The fourteenth amendment, like the sections it replaces, is a limitation upon the power of the legislature, rather than a grant.

The fourteenth amendment was prepared and submitted to the people by the 1929 session of the legislature. The reforestation law was enacted by the 1931 session, composed largely of members who served in the 1929 session. While this fact is not of controlling importance, it is a significant circumstance to be considered. We know that reforestation was the subject of much public discussion prior to the adoption of the fourteenth amendment. The particular pains taken to embody a special provision relating to the subject in the general amendment is itself a striking evidence of

the fact. The carefully prepared act of the 1931 session of the legislature is a contemporaneous construction of the amendment by men who participated in drafting and submitting it to the people.

"Courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it. *Aldridge v. Williams,* 3 How. 24; *Preston v. Browder,* 1 Wheat. 120." *United States v. Union Pac. R. Co.,* 91 U. S. 72.

"If the words of the law seem to be of doubtful import, it may then perhaps become necessary to look beyond them in order to ascertain what was the legislative mind at the time the law was enacted; what the circumstances were under which the action was taken; what evil, if any, was meant to be redressed; what was the leading object of the law, and what the subordinate and relatively unimportant objects." *Maryland Agricultural College v. Atkinson,* 102 Md. 557, 62 Atl. 1035.

"Constitutions are to be construed as the people construed them in their adoption, if possible, and the public history of the times should be consulted, and should have weight in arriving at that construction." (Syllabus). *Bay City v. State Treasurer,* 23 Mich. 499.

"To ascertain the intention of a statute, it should be read in view of all the surrounding facts and circumstances under which it was enacted and, it may be added 'common sense and good faith are the leading and principal characteristics of all interpretation.' (*Bank v. Haywood,* 62 Mo. App. 550; Potter's Dwarris on Statutes and Constitutions, p. 48; *Sedalia v. Smith,* 104 S. W. 21, 206 Mo. 346)." *Lexington ex rel. Menefee v. Commercial Bank,* 130 Mo. App. 687, 108 S. W. 1095.

We are of the opinion that the act, in so far as it is challenged here, is constitutional as being within the power reserved to the legislature by the fourteenth amendment. This conclusion disposes of

respondents' attack upon the act based upon § 12, article XI, of the constitution, the so-called Home Rule provision.

It is urged by respondents that appellant should be remitted to chapter 62, Laws of 1931, p. 201 (Rem. Rev. Stat., § 11315-1, *et seq.*), for relief. We do not think the case at bar falls within the provisions of that act. The appellant is not seeking here to enjoin the levy or collection of a tax. It seeks by mandamus to compel respondents to perform a certain ministerial act, in compliance with an express statutory mandate. *Denny v. Wooster,* 175 Wash. 272, 27 P. (2d) 328.

The judgment will be reversed, and the case remanded for further proceedings in accordance with this opinion.

BEALS, C. J., MAIN, TOLMAN, HOLCOMB, and BLAKE, JJ., concur.

STEINERT, J. (dissenting)—It is sometimes the case that, in dealing with a given legal problem, the members of a particular court may all agree upon certain fundamental principles, and yet, having arrived at a point of divergence, their reasoning may lead them to wholly different conclusions.

In the majority opinion are stated many general principles with which I am in accord, but I can not follow its reasoning to the point of its destination and result.

If I correctly interpret the majority opinion, it recognizes that, while the fourteenth amendment departed from the previous rigid constitutional requirement that all property, generally, in the state should be assessed and taxed at a uniform and equal rate, yet by its terms the constitution as thus amended still requires and specifically demands that *"all taxes shall*

*be uniform upon the same class of property within the territorial limits of the authority levying the tax."* That is the premise from which I start and, based upon which, my reasoning leads me to a contrary conclusion.

The majority opinion also points out that, by the fourteenth amendment, all real estate shall constitute one class, with the proviso that mines, mineral resources and lands devoted to reforestation are made a distinct sub-class for special treatment. With that, I also agree. The opinion then says that the reforestation act is a highly remedial one, having for its purpose the conservation of a basic resource of the state. That, likewise, may be taken as true. The opinion then reminds us that constitutions are not written in technical language, and that simplicity and brevity have always been sought in drafting them; further, that it is a cardinal rule of construction that the language of a constitution is to be taken in its general and ordinary sense. There can be no dispute as to the rule just stated, nor should there be any exception in the endeavor to draft constitutions in plain and simple language, devoid of technicalities.

The majority opinion then says that the reforestation act is a contemporaneous construction of the constitutional amendment, because the act was passed by the 1931 legislature, composed largely of members who had served in the 1929 legislature, which prepared the amendment and submitted it to the people. While I might pass this statement as in nowise determinative of the question here, or at least as not affecting my conclusion, I do not wish to let the statement stand unchallenged. It is not the legislative function to interpret the constitution, and certainly the legislature can not, by passing a statute, thereby declare or determine that it is constitutional; nor can it say that the con-

stitution is to be interpreted according to what the legislature meant in a particular legislative act. The legislature may express its own intent; but whether its act embodying that intent meets the requirement of the constitution, is wholly a judicial question and rests with the courts only.

The constitution is not so elastic or so anæmic that it must bend or bow to the will or direction of the legislature. The constitution is the fundamental law of the land, absolute, permanent and unalterable, except by the authority from which it emanates. It has a stability intended to protect the people against fluctuations of popular opinion or of legislative action.

With these preliminary observations, I approach the question under consideration, remembering at all times that the basic requirement of the constitution with reference to taxation is that all taxes shall be uniform upon the same class of property.

The particular language of the amendment with which we are here concerned reads as follows:

"Provided, That the legislature may tax mines and mineral resources and lands devoted to reforestation by either a yield tax or an ad valorem tax at such rate as it may fix, or by both."

The question to be decided here may be gathered from the respective contentions of the parties. It is the contention of appellant that, under the fourteenth amendment, the legislature may now exercise the entire power of taxation of "mines, mineral resources and lands devoted to reforestation" to the exclusion of such power of taxation by any other taxing agency; that the power to tax includes the power to fix the value of the property to be taxed; and that the valuation may be fixed at such rate as the legislature may prescribe. On the other hand, the respondent contends that, under the provisions of the amendment, the leg-

islature may fix the rate of levy, but may not fix the *valuation* of the property.

Now, it is apparent from the language of the proviso that, by the constitutional amendment, the legislature was given the right to tax reforestation lands either upon an alternative basis or upon a dual basis. It could confine itself either to a yield tax to or to an *ad valorem* tax; or else it could adopt both methods. In either, or any, event, also, it could prescribe the rate of taxation. But the legislature, by the statute under consideration, assumes to do more. Having decided to proceed upon a dual basis of taxation with reference to lands devoted to reforestation, it assumes by the act in question to fix, arbitrarily, the rate, or ratio, of *valuation,* for the purpose of assessment. It assumes to say that a flat amount of tax shall be levied upon all such lands, without respect to their valuation and without respect to its uniformity and equality within the class.

The legislature well knew what was meant by an *ad valorem* tax, and it hardly seems necessary to define the term. It is a matter of common knowledge that an *ad valorem* tax is a tax upon the value of the article or thing subject to taxation, and that a specific tax is one which imposes a specific sum by the head or number, or by some standard of weight or measurement, and which requires no process of assessment beyond a listing and classification of the subject to be taxed. 1 Cooley on Taxation (4th Ed.), § 52, p. 143. It will not be contended for a moment, I think, that the term "*ad valorem* tax," as used in the constitutional amendment, includes a specific tax. The very terms are inconsistent and exclusive of each other. But the legislature has assumed, by the present act, to impose a specific tax, acre for acre, regardless of their relative values.

Manifestly, all reforestation lands west of the Cascade mountains can not be of the same or equal value; the same is true of all such lands east of the Cascades. Location, topography, accessibility, adaptability, the species of timber and the extent of advancement of reforestation, all play an important part in determining the values of the lands. One tract may lie close to transportation; another may be wholly isolated. One may have been logged off many years ago and the process of reforestation may have progressed far toward another harvest; another may have been recently logged off and without any present growth whatever. These differentiating elements regulate, constitute and reflect themselves in corresponding differences in value. The legislature, however, has arbitrarily fixed all lands west of the Cascades at one value and all lands east of the Cascades at another value, irrespective of their true values within the specific class, and without regard to the comparative values between the classes.

Where taxes are levied upon a valuation, or *ad valorem,* basis, an assessment is indispensable. It is the first step in taxation, and the foundation of all that which follows it. It is a *sine qua non,* without which a tax levy has no support and becomes a nullity. 3 Cooley on Taxation (4th Ed.), § 1045, p. 2116. The legislative fiat, however, prescribes by its own arbitrary announcement what the assessed valuations shall thereafter be, regardless of what any process of assessment would show.

The majority opinion devotes some space to a discussion of the word "rate" as used in the constitutional amendment, and regards it as the "key" word to its proper interpretation.

It is undoubtedly true that the word "rate" has a various usage according to subject matter, and that,

in the lexicon pertaining to taxation, it has an equivocal meaning. It may refer to percentage of taxation, or it may refer to a rate of valuation. But the solution of the question before us does not depend altogether upon the precise meaning of the particular word, but also, and more particularly, upon the connection that it sustains to the language preceding it. It must be apparent, from the choice and arrangement of the language of the entire proviso of the amendment, that the word "rate" refers both to "yield tax" and to "*ad valorem* tax." If it does not refer to "yield tax," then the legislature has been given no direction whatever by which it shall proceed under that form of taxation. There could be no reason or sense in providing that the legislature should fix the rate under an *ad valorem* tax but not under a yield tax. Nor did the legislature give it that interpretation, for in § 10 of the very statute under consideration, it fixed a rate of twelve and one-half per cent of the *market value* of the forest crop, based on the full current stumpage rates; thus indicating its understanding that it was required to fix the rate or percentage of tax under either, or both, methods of taxation.

Furthermore, however variable the word "rate" may be when applied to different subjects, it must be conceded that it should have a constant meaning when used with respect to a single subject and within the limits of a single sentence. It can not mean a percentage of *taxation* when referring to yield tax, and a percentage of *valuation* when referring to an *ad valorem* tax. It would be absurd to hold that the legislature could arbitrarily say that the yield from all forest lands should be considered the same. Is it any more logical to say that the legislature may arbitrarily fix the value of all forest lands at the same figure?

But even if the word "rate" be limited to the phrase

"*ad valorem* tax" immediately preceding it, as the majority opinion construes it, then the legislature is commanded by the constitutional amendment to proceed upon an *ad valorem* basis, which means upon the basis of the *value* of the property. The majority opinion is perforce driven to interpret the amendment as meaning that the legislature is to proceed upon an *ad valorem* basis, but that, in doing so, it may fix the *value* of the property at any figure that it sees fit. The difficulty with, and the impossibility of, such a conclusion is (1) that the result is not an *ad valorem* tax at all; (2) that the legislature has not fixed or applied any *rate* whatever to values, but has imposed a fictitious and invariable value upon all lands of the same class; and (3) that the legislature has assumed the power of assessment, whereas the constitution merely permits it to fix the rate of taxation.

The vice of the whole thing is best illustrated in just what the legislature has done in this instance. It has said that all forest lands west of the Cascade mountains are of equal value, and that all such lands east of the Cascades are, likewise, of equal value. In other words, the legislature has not considered *rate* at all. It has taxed the lands specifically by the acre, and has taken no account either of their actual value or of any rate of percentage of their value.

In conclusion, it may be said that the constitution does not prevent the accomplishment of the purpose of the act as set forth in § 1 thereof. On the contrary, it specifically points the way. All that the legislature had to do, in order to accomplish its purpose, was to fix a rate of levy on reforestation lands sufficiently low to encourage the industry, at the same time leaving the field open for a proper assessment in order to determine the comparative values of the lands. In this way, the purpose of the act would have been effected,

and at the same time the basic requirement of the constitution as to uniformity and equality would have been preserved.

In my opinion, § 7 of the act is wholly unconstitutional. I therefore dissent.

MITCHELL and MILLARD, JJ., concur with STEINERT, J.