[No. 35315.   *En Banc.*   December 17, 1959.]

CLIFF YELLE, *as State Auditor, Appellant,* v. WARREN BISHOP, *as State Budget Director, et al., Respondents.*[1]

[1]Reported in 347 P. (2d) 1081.

The Attorney General, *Thomas L. O'Leary* and *Thomas R. Garlington, Special Assistants*, for appellant.

The Attorney General, *Harold S. Shefelman, Special Assistant, Weter, Roberts & Shefelman*, and *John S. Robinson*, for respondents.

HUNTER, J.—This action was instituted under the Uniform Declaratory Judgments Act, RCW 7.24, by state auditor Cliff Yelle against state budget director Warren Bishop and state treasurer Tom Martin, for the purpose of testing the constitutionality of Laws of 1959, chapter 328, p. 1601, known as the budget and accounting act. The act establishes a comprehensive and complete new budget and accounting system for all activities of state government, to provide an efficient, modern system for management of the fiscal affairs of the state.

The plaintiff challenged the constitutionality of the act in six particulars, the principal challenge being that the state auditor will suffer loss of his constitutional powers, duties and prerogatives relating to his functions as general accountant of the state, and in the auditing of all claims of the state payable out of the state treasury, in violation of Art. III, §§ 1 and 20, of the state constitution. Defendant state treasurer Tom Martin did not appear in the action. Defendant budget director Warren Bishop admits that certain duties will be taken from the state auditor but denies they are constitutional duties; that they are instead statutory and may be removed by the legislature without violating the above constitutional provisions. Defendant Warren Bishop also denies the state constitution is violated by the act on any of the other grounds alleged by the plaintiff.

The trial court held that the transferring of functions from the state auditor under the act was valid and constitutional; that the other constitutional issues raised in the complaint were not properly before the court, and entered judgment accordingly. The state auditor appeals.

It is not disputed that the budget and accounting act takes from the state auditor all of his pre-auditing functions, which are presently the auditing of claims against the state treasury and the issuing of warrants to the state treasurer for payment of claims thus approved. Nor is it disputed that the post-auditing functions of the auditor are not in any way disturbed by the questioned enactment.

Appellant contends that these pre-auditing functions of the state auditor are historically inherent, and are implied

constitutional powers of the auditor which, therefore, may not be removed without being in derogation of Art. III, §§ 1 and 20, of the state constitution.

The respondent contends the duties are purely statutory and, as stated by the trial court, ". . . The Constitution so clearly states that the Auditor shall have those duties prescribed by law. If the law can give him duties, the law can take them away. . . ."

The office of state auditor is established in the executive department by Art. III, § 1, of the state constitution as follows:

"The executive department shall consist of a governor, lieutenant governor, secretary of state, treasurer, auditor, attorney general, superintendent of public instruction, and a commissioner of public lands, who shall be severally chosen by the qualified electors of the state at the same time and place of voting as for the members of the legislature."

The powers and duties of the office thus established are set forth in Art. III, § 20:

"The auditor shall be auditor of public accounts, and shall have such powers and perform such duties *in connection therewith* as may be prescribed by law. . . ." (Italics ours.)

To infer from the above language the existence of implied constitutional powers raises the question of what the framers of the constitution intended. The appellant argues that the traditional and inherent powers of the office were fully understood by the framers of our constitution, they therefore intended that such powers attach to the constitutional office of auditor. The respondent, on the other hand, contends the express language of § 20 places all of the powers and duties of the state auditor exclusively in the hands of the law-making body.

In determining the meaning of a constitutional provision, the intent of the framers, and the history of events and proceedings contemporaneous with its adoption may properly be considered. *Bowen v. Department of Social Security*, 14 Wn. (2d) 148, 127 P. (2d) 682 (1942); *Sears v. Western Thrift Stores*, 10 Wn. (2d) 372, 116 P. (2d) 756

(1941); *State ex rel. Mason County Logging Co. v. Wiley,* 177 Wash. 65, 31 P. (2d) 539 (1934); *Morgan v. Board of School Com'rs of Mobile County,* 248 Ala. 22, 26 So. (2d) 108 (1946); *State ex rel. State R. Comm. v. Ramsey,* 151 Neb. 333, 37 N. W. (2d) 502 (1949).

██ In considering these contentions as to what was intended by the language of § 20, it is proper to examine the deliberations of the delegates at the constitutional convention, when the establishment of the office was under consideration. The official minutes of proceedings of the constitutional convention in some respects are incomplete; however, the proceedings of July 25, 1889 were reported in the Tacoma Daily Ledger on July 26, 1889. This report, a first-hand account of a contemporaneous event, may properly be considered under the rule stated above. It reads as follows:

"Executive Department Article Considered in Committee of the Whole.

" . . .

"Section 1 of the executive department article was read:

"Sec. 1. The executive department shall consist of governor, lieutenant governor, secretary of state, treasurer, auditor, attorney general, superintendent of public instruction, and a commissioner of public lands, who shall be severally chosen by the qualified electors of the state at the same time and place of voting for the members of the legislative assembly.

"Moved to Strike Out.

"Mr. Sharpstein moved to amend the section by striking out lieutenant governor and commissioner of public lands.

"Mr. Dickey called for a division of the question. Mr. Sharpstein had no objection. He merely did not want useless officers, and did not think that either officer was required.

"The question was considered separately.

"Mr. Weir said the impression seems to be that the lieutenant governor would be only a presiding officer of the senate. The committee believed that there would be many state institutions and such an officer as supervisor was necessary.

"Mr. Dunbar, as a politician, would be in favor of the office of lieutenant governor, but as a member of the convention he thought such an officer would be a superfluity just at this time,

## "Thought it Necessary.

"Mr. Browne regarded the office of lieutenant governor as a necessary office.

"Mr. Godman thought a lieutenant governor was not usually selected for his ability but for his peculiar ability as a political manipulator.

"Mr. Dyer said a lieutenant governor would be necessary to serve as chairman of the boards it will be found advisable to constitute.

"Mr. Buchanan opposed the amendment, and stated that as the president of the senate succeeded the governor, it would take a man off the floor as a representative of his constituency.

"Mr. McElroy was opposed to any unnecessary officers.

"Mr. Gowey spoke in favor of the report of the committee.

## "In Other States.

"J. Z. Moore said that in every state where there is no lieutenant governor some other officer is substituted to insure succession.

"Mr. Lillis thought that no man should succeed to the governorship who had not been elected for that particular purpose.

"Mr. Cosgrove thought the amendment purely economical in character and he therefore opposed it.

## "Motion to Strike Out Lost.

"Section One Adopted Without Being Amended—A Prolonged Debate.

"Mr. Myers offered a substitute for section 1, leaving out lieutenant governor and land commissioner, and giving the legislature power to increase the number of officers. Lost.

"The motion to strike out lieutenant governor was defeated by a vote of 38 to 31.

"On the question of striking out the office of commissioner of public lands Mr. Sharpstein said that he wished amendment to prevail because he thought the office not needed. He preferred a board composed of state officers to attend to the public lands.

## "Possibly a Grievous Mistake.

"Mr. Bowen thought it would be a grievous mistake not to have an executive head for so important a department of state.

"Mr. Weir stated that none of the delegates fully comprehended the magnitude of the public lands in this territory. Such an executive officer will not be a fifth wheel, but his duties will be as important as any state officer.

"RULED OUT OF ORDER.

"Mr. Gowey moved to amend Mr. Sharpstein's amendment by inserting after 'secretary of state,' the words 'who shall be exofficio commissioner of public lands.' This was ruled out order [sic].

"Mr. Buchanan offered a substitute striking out commissioner of public lands and inserting, 'lieutenant governor, treasurer and attorney general shall constitute the board of state and school land commissioners.'

"After a long debate the substitute was lost. Mr. Buchanan alone voting for it.

"VOTED IT DOWN.

"Mr. Gowey again offered the motion previously ruled out of order, and it was voted down. Mr. Sharpstein's amendment striking out office of land commissioner was also lost. *Mr. Myers moved to strike out auditor.* Lost. The section as reported by the commissioners [sic] was then adopted." (Italics ours.)

We find no record in the proceedings relative to consideration of the powers and duties of the office in § 20, other than the consideration of the salary and the adoption of the section in its present form.

On July 26, 1889, at the time of the adoption of Art. III, § 25 (which was then § 27), in the Minutes of Proceedings of Constitutional Convention at page 201, the following appears:

"Mr. Godman moved to amend by adding to section 27,

" 'The legislature may in its discretion abolish the offices of lieutenant governor, auditor and commissioner of public lands.' . . . And the following thirty-seven members voted aye. . . . the following thirty-two members voted no. . . ."

From these intriguing deliberations by the fathers of our constitution, it appears clear there was disagreement as to the necessity of including these three offices in the executive department as constitutional offices; and their establishment was with the qualification that their continued existence be at the will and pleasure of the legislature, as provided by its authority for their abolishment in § 25.

The attitude of the framers in regard to the necessity of designating the office of auditor as a constitutional office is

again exemplified in Art. II, § 5, where they provided for certain county offices, but the office of county auditor was not among those enumerated; the framers again chose to leave the existence or nonexistence of such office within the legislative discretion.

■ With this attitude of the framers of our constitution toward these offices, we do not believe it reasonable to conclude they intended any powers for the office of state auditor, except as they specifically provided by the express language of Art. III, § 20:

".  .  . The auditor *shall be auditor of public accounts,* and shall have such powers and perform such duties *in connection therewith* as may be prescribed by law. . . ." (Italics ours.)

■ We believe the words *"in connection therewith"* relate directly to his duty as *auditor of public accounts* to be fixed by the lawmaking body; that his powers and duties as auditor, by this language, are within the exclusive discretion of the legislature, which may be fixed, enlarged, or diminished by that body at any time.

■■ This conclusion is further supported by the well-established rule of constitutional construction, *"expressio unius est exclusio alterius."* The express mention of one thing implies the exclusion of the other. *State ex rel. Banker v. Clausen,* 142 Wash. 450, 253 Pac. 805 (1927). By the application of this principle, it is only when the constitution is silent as to these duties that constitutional duties may be implied. This rule must yield when the surrounding facts and circumstances satisfactorily demonstrate the converse to be true. However, the facts and circumstances surrounding the adoption of Art. III, §§ 1, 20 and 25, necessitate the application of the rule in this case. The principle of *expressio unius* was properly applied in the case of *Lockwood v. Jordan,* 72 Ariz. 77, 231 P. (2d) 428 (1951). In that case the constitutionality of an enactment was being challenged which created the office of post auditor. Under the Arizona constitution, the state auditor was named as an officer of the executive department, whose duties were to be as prescribed by law. The court said:

"Section 9 of article 5 provides: 'The powers and duties of secretary of state, state treasurer, state auditor, attorney-general, and superintendent of public instruction shall be as prescribed by law.'

" . . .

"Adverting first to the contention that the Act under consideration violates article 5, sections 1 and 9 of the state constitution, the precise question was presented to this court in the case of *Shute v. Frohmiller*, 53 Ariz. 483, 90 P. 2d 998, 1001. . . .

"This court in that case observed that if the constitution had created the office of attorney general without referring to its powers and duties it might have been true under the authorities cited that the term 'attorney general' had been used in its common law acceptation since Arizona is a state in which the common law prevails; but that when the constitution provided in the same article in which it created the office of attorney general that he should perform such duties as were prescribed by the constitution and as may be provided by law and that his duties 'shall be "as prescribed by law" ' it could not be said that the constitution was silent as to his powers and duties; that while it was true the constitution did not enumerate his duties but in stating that they shall be as 'prescribed by law' it referred to them and clearly made it the duty of the legislature to say what they should be. The court asserted that the expressions, 'as provided by law' and 'as prescribed by law' are susceptible of no other construction. It then concluded that the attorney general was not a common law officer, upon whom 'the duties and powers of the attorney general as the same was known at common law' had been engrafted but was one whose powers and duties could be ascertained only by resort to the statutes. The court further said:

" 'Notwithstanding the holding in these cases, (cases cited by respondent) we are clearly of the view that the mere naming of the attorney general in the constitution of this state does not amount to an implied restriction on the authority of the legislature in prescribing his duties. It is true in this state, as in others, that the office of attorney general, together with the other executive offices created by the constitution, is imbedded in that instrument, but it is equally true that the authority of the legislature to prescribe what the duties and powers of those occupying these offices shall be is imbedded there also, and, this being true, no common-law powers or duties can attach to that office but only those prescribed by statute.' . . . "

In the instant case the Washington constitution is not silent as to the powers and duties of the office of auditor and the common-law duties or implied powers cannot attach to the office, but only those *as may be prescribed by law*. Moreover, the Washington constitution is a limitation upon the powers of the legislature, instead of a grant of powers, and so far as the power of the legislature is not limited by the constitution it is unrestrained. *Union High School Dist. No. 1, Skagit County v. Taxpayers of Union High School Dist. No. 1*, 26 Wn. (2d) 1, 172 P. (2d) 591 (1946). This being so, in view of the affirmative direction that the powers and duties of the state auditor shall be as prescribed by law, it cannot be reasonably concluded that Art. III, §§ 1 and 20, was intended as a limitation upon the powers of the legislature.

The appellant relies heavily upon the cases of *Hudson v. Kelly*, 76 Ariz. 255, 263 P. (2d) 362 (1953), and *Wright v. Callahan*, 61 Idaho 167, 99 P. (2d) 961 (1940), which hold that the legislature cannot denude a constitutional office of all its powers in the absence of authority from the constitution to do so, as this would amount to an abolishment of the office for which their constitutions did not provide. In the instant case the office was not denuded of all its powers and, contrary to the constitutions of those states, our constitution expressly provides for the abolishment of the office by the legislature.

We do not find it necessary to further discuss the cases cited from other jurisdictions since Washington is the only state in the Union which has the constitutional provision providing for the abolishment of the office of state auditor. This unique provision is singularly significant in view of the fact that the framers of our constitution questioned the necessity of establishing such an office. We are satisfied that Art. III, § 20, considered in the light of the state of mind of our convention delegates at the time of the adoption of this section, nullifies any inference that this office was to have any powers other than statutory powers, as they specifically provided.

·.. The appellant cites from our jurisdiction *State ex rel. Johnston v. Melton,* 192 Wash. 379, 73 P. (2d) 1334 (1937). This case has no application to the instant case since that decision was based upon the doctrine of separation of powers, and such an issue is not before us.

We are satisfied the legislature acted within the constitutional mandate of Art. III, § 20, when by Laws of 1959, chapter 328, it removed all of the pre-auditing functions from the office of state auditor, previously given to that office by this same lawmaking body. These duties are statutory only, and the trial court did not err in so holding.

The appellant contends the trial court erred in refusing to consider the issues relating to the unlawful delegation of legislative power; disbursement of funds without appropriation in violation of Art. II, § 37; and that the statute was void because so indefinite, uncertain, and vague as to be unenforcible.

The sections of chapter 328 placed in issue by these allegations immediately and directly affected the operation of appellant's office. Also, invalidation of a section of the act might have altered the remainder to such an extent as to make it incomplete and inoperative. *In re Hendrickson,* 12 Wn. (2d) 600, 123 P. (2d) 322 (1942); *State v. Canyon Lbr. Corp.,* 46 Wn. (2d) 701, 284 P. (2d) 316 (1955). The appellant had sufficient interest in the statute's effect on the operation of his office to question the constitutionality of the act on any issue that might affect its validity as an entire act. The appellant is therefore correct and such issues raised are properly before this court. Moreover, the operation and validity of chapter 328 is a question of vital public interest. *State ex rel. Yakima Amusement Co. v. Yakima County,* 192 Wash. 179, 73 P. (2d) 759 (1937).

Appellant contends that Laws of 1959, chapter 328, violate Art. II, § 37, of the Washington constitution which provides that

"No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."

■ This provision of the constitution is not violated by an act which incidentally or impliedly amends prior acts. *Naccarato v. Sullivan,* 46 Wn. (2d) 67, 278 P. (2d) 641 (1955).

■ When an act is complete in itself, and does not require reference to other statutes to understand its purpose and meaning, such an act is not within the contemplation of Art. II, § 37. The purpose and scope of this provision was defined by this court in *Spokane Grain & Fuel Co. v. Lyttaker,* 59 Wash. 76, 109 Pac. 316 (1910), as follows:

" . . . The mischief against which the above constitutional provision is directed was thus defined by Judge Cooley in *People v. Mahaney,* 13 Mich. 481:

" 'This constitutional provision must receive a reasonable construction, with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws. An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not republished, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision, and cannot be held to be prohibited by it without violating its plain intent.' . . .

"In *Warren v. Crosby, supra,* [24 Ore. 558, 34 Pac. 661 (1893)], the court said:

" ' . . . The evil it sought to remedy is the mode in which the legislative power was sometimes exercised in the enactment of revisory or amendatory laws. This evil, as is well known, was the practice of amending or revising laws by additions or other alterations, which, without the presence of the original law, were usually unintelligible. Acts were passed, amending an existing statute by substituting one phrase for another, or by inserting a sentence, or by repealing a sentence, or a part of a sentence, in some portion or section thereof, which, as they stood, often conveyed no

meaning, and, without examination and comparison with the original statute, failed to give notice of the changes effected. . . . If the act is in itself complete and perfect, and is not amendatory and revisory in its character, it is not interdicted by this provision, although it amends by implication other legislation upon the same subject. Such an act, although it may operate to change or modify prior acts, is not within the mischief designed to be remedied by said section 22. [Ore. equivalent to Art. II, § 37]'

" . . .

"In *Snyder v. Compton, supra,* [87 Tex. 374, 28 S. W. 1061 (1894)], the court said:

" ' . . . The practice which it was the purpose of the provision in question to prohibit was that of amending a statute by referring to its title, and by providing that it should be amended by adding to or striking out certain words, or by omitting certain language, and inserting in lieu thereof certain other words. It was not intended to prohibit the passage of a law which declared fully its provisions without direct reference to any other act, although its effect should be to enlarge or restrict the operation of some other statutes.'

" . . . Nearly every legislative act of a general nature changes or modifies some existing statute, either directly or by implication, and as said by the court in *Ex parte Pollard, supra* [40 Ala. 77], 'Whether an amendatory or an original act should be employed is a matter of legislative judgment and discretion which the courts cannot control.' The purpose of the constitutional provision was to protect the members of the legislature and the public against fraud and deception; not to trammel or hamper the legislature in the enactment of laws. . . . So long as a legislative act is complete in itself, and has a sufficient title, it satisfies the requirements of the constitution, whether it contains much or little. The legislature may embody all legislation relating to a given subject in a single act, or it may cover the subject by a succession of acts. This is entirely a matter of legislative discretion over which we can assume no control.

" . . .

" . . . So long as a legislative act is complete in itself and does not tend to mislead or deceive, it is not violative of the constitution."

The rule of the *Lyttaker* case, *supra,* in the interpretation and application of Art. II, § 37, has been followed in a long line of decisions by this court. The statute

here in question is complete in itself, as an act establishing a uniform budget and accounting system. The legislature sought by chapter 328 to create a complete system for carrying out a specific governmental function. This is decisive of the legislative intent to make the later enactment the law on the subject and earlier legislation is necessarily repealed by implication. *State ex rel. Port of Seattle v. The Department of Public Service*, 1 Wn. (2d) 102, 95 P. (2d) 1007 (1939); *In re Peterson's Estate*, 182 Wash. 29, 45 P. (2d) 45 (1935); *Seattle v. Clark*, 28 Wash. 717, 69 Pac. 407 (1902); *State v. Carey*, 4 Wash. 424, 30 Pac. 729 (1892).

The appellant contends that chapter 328, Laws of 1959, is an unconstitutional delegation of legislative power to the governor, and the budget director, empowering the governor or his agent to make the regulations necessary to attain the purpose of the enactment.

■■ This court announced in *State v. Miles*, 5 Wn. (2d) 322, 105 P. (2d) 51 (1940):

"It is well settled that the legislature may, under proper circumstances, delegate to executive or administrative officers and boards authority to promulgate rules and regulations to carry out an express legislative purpose, or to effect the operation and enforcement of a law. The general principle governing the conditions under which such power may be delegated has been succinctly stated in 11 Am. Jur. 955, § 240, as follows:

" 'A legislature, in enacting a law complete in itself and designed to accomplish the regulation of particular matters falling within its jurisdiction, may expressly authorize an administrative commission, within definite valid limits, to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose.' "

■■ *In Keeting v. Public Utility Dist. No.1*, 49 Wn. (2d) 761, 306 P. (2d) 762 (1957), the requirements for valid delegation of administrative power were enumerated:

" . . . It is unconstitutional for the legislature to abdicate or transfer to others its legislative function. It is not unconstitutional for the legislature to delegate administrative power. In so doing, the legislature must define (a) what is to be done, (b) the instrumentality which is to ac-

complish it, and (c) the scope of the instrumentality's authority in so doing, by prescribing reasonable administrative standards. [Citations omitted.]"

In the instant case the legislature declared that the act was to establish a uniform budget and accounting system for the state government. The legislature specified the governor, through the budget director, as the instrumentality to accomplish this objective.

There remains only the question of whether the legislature has defined the scope of the instrumentality's authority by prescribing reasonable administrative standards. The act provides that the governor, personally or through his designated agent, is to issue the regulations necessary to carry out the purpose of the act. Such regulations are to provide for a comprehensive orderly basis for fiscal management and control. Such terms as "accounting and recording system" and "fiscal management and control" specify a definite and highly complex activity, beyond which the instrumentality cannot act. The fact that the standards and limitations are not immediately apparent to every layman casually perusing the statute, does not establish their nonexistence.

It would have been impossible, in a single legislative session, to set forth all the requirements of such a complex activity as fiscal management. In carrying out the legislative purpose, directions must be promulgated for cost and expenditure accounting; payroll, investment and stores accounting; as well as directions in connection with accounting for bond funds, trust and agency funds, working capital funds, refunds, and a multitude of kindred functions. Each of these general areas divides into a multitude of specific functions requiring a myriad of detailed directions and regulations relative to their establishment and operation, if the purpose of the act is to be accomplished.

The complexity and character of the subject matter of legislation are to be considered in determining whether there has been an unlawful delegation of legislative power. *Senior Citizens League, Inc. v. Department of Social Security*, 38 Wn. (2d) 142, 228 P. (2d) 478 (1951); *Kelleher*

*v. Minshull*, 11 Wn. (2d) 380, 119 P. (2d) 302 (1941); 11 Am. Jur. 948, Constitutional Law, § 234. The rule-making requirements of chapter 328, we believe, present a classic example of the necessity for the legislative body deferring to administrative expertise. The above contention of unconstitutional delegation of legislative power to the governor and the budget director has not been sustained.

The appellant contends that § 22 of chapter 328 unlawfully delegates legislative power to the federal government. We find no delegation of authority to the federal government in the language of § 22; no officer or agency of the federal government is given any power to make or promulgate rules and regulations, or to perform any act pursuant to chapter 328.

Whether to accept or reject federal funds under federal-aid programs is a matter of legislative choice. When a federal-aid program sets forth certain conditions precedent to the receipt of such funds, the legislature may properly take cognizance of such conditions. There is no reason to conclude that the legislature cannot require administrative officers and agencies to take cognizance of the same conditions as a standard limiting their rule-making power.

Under this heading of unlawful delegation, appellant also discusses, in connection with § 22, the rule that the legislature may adopt existing federal rules, regulations, or statutes, but attempts to adopt future federal rules, regulations, or statutes are void.

Nothing in the language of § 22 leads us to the inexorable conclusion that it is intended to adopt future federal rules, regulations, and statutes. To accept appellant's contention would require reading into the statute the future tense and ignoring its use of the present tense. The statute adopts only present federal rules, regulations, and statutes, if any.

If we should assume the language of § 22 were susceptible of two interpretations, one constitutional and the other unconstitutional, the constitutional interpretation must be adopted. *State ex rel. Northern Pac. R. Co. v. Henneford*, 3 Wn. (2d) 48, 99 P. (2d) 616 (1940); *Casco Co. v.*

*Public Utility Dist. No. 1,* 37 Wn. (2d) 777, 226 P. (2d) 235 (1951); *Huntamer v. Coe,* 40 Wn. (2d) 767, 246 P. (2d) 489 (1952).

Appellant next contends that chapter 328 violates Art. VIII, § 4, as amended by the eleventh amendment, by authorizing the disbursement of treasury funds without appropriation.

Art. VIII, § 4, and the eleventh amendment, apply only to those funds specified by the constitution as state or public funds. *State ex rel. Washington Toll Bridge Authority v. Yelle,* 195 Wash. 636, 82 P. (2d) 120 (1938), or those which the legislature intended should be subject to the constitutional restriction, *State ex rel. State Employees' Retirement Board v. Yelle,* 31 Wn. (2d) 87, 195 P. (2d) 646; 201 P. (2d) 172 (1948). There is no indication that the provisions of chapter 328, Laws of 1959, affect any of the funds which are specified by the constitution as state funds. As to funds which the legislature initially placed within the constitutional restriction, the legislature has the power to remove them from the restriction by a proper exercise of the legislative will. The funds specified by the appellant are those requiring appropriation by legislative direction. The legislature has chosen by chapter 328 to make appropriations no longer a necessary condition precedent to disbursement of such funds.

Appellant contends chapter 328 unlawfully delegates the legislative power to prescribe the duties of state treasurer. We disagree. The enactment affirmatively defines the duties of the state treasurer and we find nothing therein authorizing the governor or budget director to disturb the existing duties of that office.

Appellant's further contentions that the act empowers the governor to exercise a continuing veto power, and that the statute is void because it is vague and uncertain are without merit.

Having determined the appellant has not successfully sustained these challenges to the constitutionality of the questioned enactment, the judgment of the trial court establishing its validity is affirmed.[2]

Weaver, C. J., Finley, Rosellini, and Ott, JJ., concur.

Donworth, J., concurs in the result.

Hill, J. (dissenting)—I dissent. The constitution of the state of Washington says "The auditor shall be the auditor of public accounts." Art. III, § 20.

The majority see in the additional words "and shall have such powers and perform such duties in connection therewith as may be prescribed by law," the authority of the legislature to strip the office of its authority over public accounts.

In my view, those words are not intended to authorize the subtraction by the legislature of anything from the primary duty indicated, *i.e.,* "The auditor shall be the auditor of public accounts," but rather to enable the legislature to amplify his powers and duties in connection with that primary duty.

Historically, the purpose of an independent auditor was to be able to challenge the legality of the expenditure of funds by the various agencies, branches, and divisions of state government before the public funds had gone down the drain.

The state auditor has, through the years, refused to issue vouchers where he questioned the propriety of the use being made of public funds.

Sometimes we have held that he was mistaken and directed the issuance of certain vouchers: *State ex rel. Oregon State Highway Comm. v. Yelle* (1955), 47 Wn. (2d) 804, 289 P. (2d) 1027; *State ex rel. State Employees' Retirement Board v. Yelle* (1948), 31 Wn. (2d) 87, 195 P. (2d) 646, 201 P. (2d) 172; *State ex rel. Van Orsdel v. Yelle,* (1942), 15 Wn. (2d) 320, 130 P. (2d) 889; *State ex rel. Washington Toll Bridge Authority v. Yelle* (1938), 195 Wash. 636, 82 P. (2d) 120; and, sometimes, we have held that he was

---

[2]The court wishes to acknowledge the assistance obtained from the excellent thesis by Quentin Shipley Smith: An Analytical Index of the Journal of the Washington State Constitutional Convention, 1889. University of Washington 1947.

right and that the expenditure could not lawfully be made: *State ex rel. Washington State Building Financing Authority v. Yelle* (1955), 47 Wn. (2d) 705, 289 P. (2d) 355; *State ex rel. Eastvold v. Yelle* (1955), 46 Wn. (2d) 166, 279 P. (2d) 645; *State ex rel. Davis v. Clausen* (1931), 160 Wash. 618, 295 Pac. 751; *State ex rel. Banker v. Clausen* (1927), 142 Wash. 450, 253 Pac. 805.

I concede, of course, that the legislature can, if it so desires, abolish the office of state auditor; but until it does, or until the constitutional statement of his duties is amended, the auditor should remain the "auditor of public accounts."

By the provisions of Laws of 1959, chapter 328, the state auditor ceases to be the "auditor of public accounts," and to that extent I would hold the act to be unconstitutional.

MALLERY and FOSTER, JJ., concur with HILL, J.

March 16, 1960. Petition for rehearing denied.

